UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

NOT FOR PUBLICATION

| | |
|---|---|
| _____ ) | |
| In re ) | Chapter 11 |
| Natural Feast Corporation, ) | Case No.  03-10462-JBR |
| Debtor. ) | |
| _____ ) | |
| ) | |
| Naturally ME, Inc., ) | |
| Plaintiff, ) | Adversary Proceeding |
| v. ) | Case No.  04-1249 |
| Alan Attridge, ) | |
| Defendant. ) | |
| _____ ) | |
| ) | |
| In re ) | Chapter 7 |
| Alan Attridge, ) | Case No. 05-42798-JBR |
| Debtor. ) | |
| _____ ) | |
| ) | |
| Naturally ME, Inc., ) | |
| Plaintiff, ) | Adversary Proceeding |
| v. ) | Case No. 05-4095 |
| Alan Attridge, ) | |
| Defendant. ) | |
| _____ ) | |

**MEMORANDUM OF DECISION**

These cases came before the Court for trial in the above adversary proceedings, consolidated

for trial, in which the Plaintiff, Naturally ME, Inc. ("Plaintiff"), seeks monetary damages and non-

monetary relief, including an injunction compelling the turnover of certain assets allegedly owned by

the corporate debtor, Natural Feast Corporation ("NFC"), and withheld or converted by the

individual debtor, Alan Attridge ("Defendant"), and a declaration that debt owed by the Defendant

to the Plaintiff is nondischargeable.  The Amended Verified Complaint [AP No. 04-1249, #40] was

filed in Adversary Proceeding No. 04-1249 following the sale of the corporate debtor's assets to the

Plaintiff and specifically seeks damages for conversion of certain assets (Count I), an injunction

compelling the turnover of those assets and prohibiting the Defendant from using the same (Count

III), and an order holding the Defendant in civil contempt and awarding damages for the contempt

(Count V).[1]  The Complaint filed against the Defendant [AP No. 05-4095, #1] seeks declarations

that the debts owed to the Plaintiff are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A)

(Count I), § 523(a)(4) (Counts IV and V), and § 523(a)(6) (Count VI).[2]

Although there was a great deal of testimony and evidence presented, the facts are largely

undisputed.  NFC, under the direction of the Defendant, developed and manufactured certain

gluten-free products.  The Plaintiff, an entity formed by some individuals who had previously

worked for and/or invested in NFC, purchased NFC's assets from the Chapter 11 Trustee over the

objection of the Defendant.  At issue herein is whether the Defendant turned over all of the assets,

most importantly some recipes, to the Chapter 11 Trustee, and in turn, the Plaintiff.  After hearing

six (6) days of testimony, considering the demeanor and credibility of the witnesses, reviewing the

exhibits in evidence, hearing arguments of counsel and reviewing the various pre- and post-trial

pleadings submitted by each party, the following constitutes the Court's findings of fact and

conclusions of law in accordance with Fed. R. Bankr. P. 7052.

Jurisdiction

The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334.  These

matters are core proceedings pursuant to 28 U.S.C. § 157(b)(2).  Both parties cited Massachusetts

law in their  proposed Findings of Fact and Conclusions of Law; therefore the Court shall apply

Massachusetts law in reaching its conclusions.

---

[1]   After the conclusions of the trial, the Plaintiff withdrew its claims with respect to Counts II and IV and
therefore those Counts will be dismissed.
[2]   After the conclusion of the trial, the Plaintiff withdrew its claims with respect to Counts II and III and
therefore those Counts will be dismissed.

Findings of Fact

The focus of the instant case is recipes that were at some point owned, produced, or created by NFC, and then sold to the Plaintiff.  For ease of understanding, the Court is using its own defined terms in order to distinguish between the different recipes discussed herein.  These are not terms of art used by the parties.  The recipes are the "know-how, trade secrets and other proprietary information, and formulae related to the creation, production and manufacturing of certain wheat free, gluten free and non-hydrogenated oil food products including, but not limited to, pies and dessert products, for celiacs, diabetes, and other persons with special dietary needs."  (Pl. Ex. 68, Appendix A)[3]  The know-how, trade secrets, other proprietary information and formulae include a list of ingredients for each of the products, and the specific amount of each ingredient, mixing instructions, and cooking or baking instructions.  The "Commercial Recipes" are those products previously made and sold by NFC and which the Plaintiff is currently producing for sale, specifically: apple pie, apple cranberry pie, blueberry pie, pumpkin pie, chocolate mousse pie, pie shells, and streusel dough (toppings for the fruit pies).  The "Missing Recipes" are those recipes of which the Court, upon significant evidence and testimony, finds exist or existed and were owned by NFC but not delivered to the Plaintiff.  Specifically these are:  Boston cream pie, non-dairy lemon pie, key lime pie, walnut torte cake (which includes carrot cake, chocolate cake, and muffins as such can be easily made as spin-offs of the walnut torte cake), pizza dough, and brownies. The Plaintiff did not introduce evidence of damages suffered as a result of the Defendant's failure to turn over all of the Missing Recipes.  Instead the evidence of damages was limited to a subset of the Missing Recipes, a

---

[3]  As noted below, the definition of "recipes" owned by NFC had been the subject of a dispute between the Defendant and NFC's Chapter 11 Trustee.  The dispute was resolved by the Court's Judgment of July 7, 2003 which defined recipes as "the recipes, formulas, and proprietary manufacturing processes used by the Debtor [NFC] at any time pre-petition or post-petition."  See FN [27], *infra*.  It is, in essence, the same definition as that set forth above.

group the Court will call the "Targeted Missing Recipes."  These are: Boston cream pie, non-dairy

lemon pie, carrot cake, muffins, and pizza dough.

History of Natural Feast Corp.

1.    The Defendant was diagnosed with celiac disease[4] in 1993.  (Day 1, Vol. 1, pp. 92-93)

2.    The Defendant and his wife, Nina Fishman Attridge ("Mrs. Attridge") initially formed a

partnership in 1993 to manufacture foods that could be eaten by celiacs.  (Day 3, Vol. 1, p. 8)  They

incorporated Natural Feast Corp. ("NFC") in Massachusetts in 1994.  (Day 1, Vol. 1, p. 93; Day 3,

Vol. 1, p. 8)  Mrs. Attridge came up with the name "Natural Feast," which NFC trademarked.  (Day

3, Vol. 1, p. 8; Day 3, Vol. 2, p. 129)

3.    Although, the original purpose of NFC was to make tasty food for the "deprived" celiac

community, NFC broadened its mission to make food that could be eaten by individuals with other

dietary restrictions, including those who are lactose intolerant, diabetics, or vegans.  (Day 1, Vol. 1,

pp. 93-95)

4.    NFC was engaged in the business of developing recipes, formulae and proprietary

manufacturing processes for pies and other products for celiacs, diabetics and other persons with

special dietary needs.  (Joint Pretrial Statement, Stipulated Fact #1.)

5.    From 1993 through 2003, the Defendant was employed by NFC as its president.  (Day 1,

Vol. 1, pp. 96-97; Day 3, Vol. 1, p. 13)  At all times relevant hereto, the Defendant was also a

shareholder of NFC.  (Joint Pretrial Statement, Stipulated Fact #2.)  Mrs. Attridge was a shareholder

and a member of the Board of Directors.  (Day 3, Vol. 2, p. 137)

6.    Based on his degree in finance and his employment in various capacities, the Defendant

was familiar with writing business plans.  (Day 1, Vol. 1, p. 91)

---

[4]  In celiac disease, the gluten or gliadin in wheat, barley, oats and rye causes an untoward reaction in the vilae
in a human being's small intestine.  (Day 1, Vol. 1, p. 91).

7.    In late 1993 or early 1994, the Defendant contacted Brian Bolster ("Bolster"), a baker, whom the Defendant had known since 1978, to discuss how to make an apple pie that could be eaten by celiacs.  (Day 1, Vol. 1, pp. 50-51)  They experimented making apple pies in the Attridges' apartment for six or seven months and eventually came up with a recipe for an apple pie and pie crust.[5]  (Day 1, Vol. 1, pp. 51-52, 57; Day 3, Vol. 1, pp. 5, 9)

8.    NFC's production history was not without some gaps.  From the fall of 1994 to the spring or summer of 1995, NFC was in production[6] in a facility on Turnpike Street in Canton.  (Day 1, Vol. 1, pp. 99-100, 115, Day 3, Vol. 1, pp. 9, 12; see Pl. Ex. 4.)  From the fall of 1995 through 1997, NFC was in production in a facility in New Bedford.  (Day 1, Vol. 1, p. 100, Day 3, Vol. 1, p. 12)  After NFC left New Bedford, it was out of production for approximately nine months and then went into production in Woburn for six months.  (Day 3, Vol. 1, p. 14)  Next, after being out of production for about three months, Bello Foods manufactured products for NFC for three months.  (Day 3, Vol. 1, pp. 14-15)  The next manufacturer was Mother Nature's Goodies, who produced the products for a period of time.  (Day 3, Vol. 1, pp. 16-17)  NFC was then out of production for almost two years.  (Day 3, Vol. 1, p. 17)

9.    NFC produced products at the Phranil Foods ("Phranil") plant in Spokane, Washington for six or seven months in 2002.[7]  (Day 1, Vol. 1, p. 102)

The Roberts Invest in NFC

10. Douglas Roberts ("Roberts") and his wife, Elise ("Mrs. Roberts"), lived across the street from the Defendant's mother in Dover, Massachusetts.  (Day 1, Vol. 2, pp. 160-161)  Roberts and the Defendant had been in the same class their senior year in high school.  (Day 1, Vol. 2, p. 174;

---

[5]  Bolster worked for NFC only for that six or seven month period and then left to go to graduate school.  (Day 1, Vol. 1, pp. 52-53, 63)
[6]  "In production" means NFC was commercially producing pies for orders.
[7]  A more detailed discussion of NFC's production history at Phranil follows.

Day 3, Vol. 1, p. 18; Day 3, Vol. 2, p. 145)  They did not have a social relationship while they were growing up.  (Day 3, Vol. 2, p. 145)

11. Roberts holds an associate degree from East Coast Aerotec.  He worked in aircraft maintenance and at gas stations before purchasing a tire business in Medfield, Massachusetts.  (Day 3, Vol. 2, p. 139)  Roberts is not a baker.  (Day 3, Vol. 2, p. 161)

12. In October 2001, Mrs. Roberts told the Defendant's mother and other neighbors that Roberts was selling his tire business and they were moving to Maine. (Day 4, Vol. 2, p. 193)  The next day, the Defendant approached Roberts about investing in NFC.  (Day 3, Vol. 1, p. 18; Day 3, Vol. 2, p. 149; Day 4, Vol. 2, p. 193)  He called Roberts "out of the blue" (Day 3, Vol. 2, p. 147), and asked to meet with him to discuss a business opportunity.  (Day 1, Vol. 2, p. 161)

13. Their first meeting lasted six hours.  (Day 3, Vol. 2, p. 147)  The purpose of that meeting was to see if Roberts would invest in NFC.  (Day 1, Vol. 2, p. 162)  The Defendant told Roberts about celiac disease and the products that had been developed.  He said that the products were wheat- and gluten-free, had no trans-fats or hydrogenated oils, and that the target market included vegetarians, people who were lactose intolerant and heart patients, so they met a wide variety of needs.  (Day 3, Vol. 2, pp. 147-148)

14. Roberts testified that the Defendant stated that he had recipes for 200-300 products, including pies, Boston cream pie, brownies, energy bars and dinners.  (Day 3, Vol. 2, pp. 148, 151, 201-202)  Roberts did not ask to see the recipes.[8]  The Defendant, however, denied representing to Roberts that the Defendant had recipes for 200-300 products.  (Day 1, Vol. 2, p. 166)  Because of his mother's relationship with the Defendant's family, Roberts trusted the Defendant.  (Day 3, Vol. 2, p. 205)

---

[8]  Roberts first learned that NFC did not have 200-300 recipes during this proceeding.  He expected that Naturally ME would receive that many recipes when it purchased the assets.  (Day 4, Vol. 1, p. 6)

15. At the meeting, the Defendant gave Roberts a Business Plan which listed the various products NFC could manufacture.  They discussed the Business Plan, the target market and how the company could grow by introducing new products on a regular basis.  The Defendant spoke of the importance of introducing new products to develop the Natural Feast brand.  (Day 3, Vol. 2, pp. 149-151; Pl. Ex. 48)

16. The Business Plan lists approximately 300 products and it does not contain any disclaimers or statements that NFC does not have recipes for these products.  It states in several places:  "Natural Feast Corporation has developed an extensive line of food products: cakes, pies, breads, breakfast muffins, organic rice entrees, organic spice blends, cookies, crackers, and pizza crusts."  (Day 1, Vol. 2, pp. 167, 170-171; Pl. Ex. 48, tab 11)

17. The Business Plan also includes a manufacturing identification chart with products and companies that would be part of a proposed alliance or partnership.  (Day 1, Vol. 2, p. 167-168; Pl. Ex. 48, tab 11)  The Defendant testified that he did not prepare the chart, and that the list of products was included in the Business Plan as part of the Merger Acquisition Alliance and Partnership Purpose ("MAAPP") plan of Steve Farkas ("Farkas") to merge companies with similar attributes.[9]  The chart describes different products each company makes which could be available to partners or alliance members, thus broadening the product mix for all.  He claimed that Farkas and Frank Hodel prepared the chart.  (Day 3, Vol. 1, pp. 52-56; Day 6, Vol. 2, pp. 196-20l; Pl. Exs. 20 and 48)

18. Some of the products in the chart are described as "test marketed."  The Defendant testified that the use of the term "test marketed" did not mean that NFC had recipes for those

---

[9]  According to the Defendant, Farkas proposed to merge companies with similar attributes and visions.  He traveled around the country meeting these companies asking if they would like to become a "partnership" or alliance.  (Day 3, Vol. 1, p. 56)  The goal of the MAAPP plan was "to bring together seven companies serving the same niche markets, possessing related values and cultures, with the intention to pool their resources in manufacturing, marketing, distribution and sales in order to minimize cost and maximize profits."  (Pl. Ex. 49, tab 11, p. 1)  This proposed plan never went beyond preliminary discussions.  (Day 3, Vol. 1, p. 56)

products and that he never represented to Roberts or Alan Redden ("Redden")[10] that "test marketed" meant he had recipes.  (Day 1, Vol.2, p. 168)

19. When Roberts first met with the Defendant, he knew that NFC was not in production at that time.  The Defendant told him about the plans to start production at Phranil.  (Day 3, Vol. 2, pp. 150-151)

20. At the end of the meeting, the Defendant asked Roberts to invest in NFC.  (Day 3, Vol. 2, p. 150)  Roberts said he wanted to think it over and discuss the possible investment with Redden, and that he wanted Redden to meet with the Defendant.  (Day 3, Vol. 2, p. 152)

21. Roberts, who had never been employed in the food industry, was intrigued by what he had learned at that meeting.  (Day 3, Vol. 2, p. 148)  He did some research on food allergies on the Internet before the second meeting and filled Redden in.  (Day 3, Vol. 2, pp. 153-154, 204) Roberts called Redden and Redden agreed to review the Business Plan and meet with the Defendant, which they did at Roberts' home two days later.  (Day 3, Vol. 2, p. 153; Day 4, Vol. 1, pp. 46-48, 194)

22. The second meeting lasted about two hours.  (Day 3, Vol. 2, p. 153)  Roberts and Redden testified that they and the Defendant discussed many of the same topics that had been covered in Roberts' first meeting with him.  They discussed the products that NFC could produce, including pies, Boston cream pie, brownies, cakes, muffins, breakfast muffins and dinner rolls.  The Defendant told them he had recipes for 200-300 products that were ready to go and could be in production at any time.  (Day 3, Vol. 2, pp. 154-156; Day 4, Vol. 1, pp. 49-50, 98-99)

23. The Defendant told Roberts and Redden NFC had a request from Marriott to make rolls right away and that NFC could do that.  (Day 3, Vol. 2, pp. 154-156; Day 4, Vol. 1, pp. 49-50, 98-99) The Defendant agreed that he told them that NFC was going to manufacture dinner rolls for

---

[10]   Alan Redden is Douglas Roberts' cousin, an investor in NFC, and an investor in Naturally ME.

Marriott Corporation; however, he claimed that he also said that the dinner rolls would be

manufactured by Cybros.[11] (Day 1, Vol. 2, p. 158)  Roberts did not recall the Defendant mentioning

Cybros to him.  (Day 3, Vol. 2, p. 151)  The Court did not receive any evidence regarding whether

NFC ever produced the dinner rolls for Marriott either directly or through Cybros.

24. They also discussed the production facility at Phranil, distribution networks and food

shows that the Defendant had attended.  (Day 3, Vol. 2, p. 155)  He also showed Redden financial

projections for NFC.  (Day 4, Vol. 1, p. 51)

25. The Defendant referred to documents in a black three ring binder that he had brought to

the meeting and showed Redden a document that contained a list of 300 products that he said could

be produced.  The Defendant told him that NFC owned the recipes for those products.  (Day 4,

Vol. 1, p. 50)

26. Redden next met with the Defendant when the Defendant and Roberts went to his

apartment about a month later.  The Defendant gave Redden a Business Plan, Plaintiff's Exhibit 48,

as well as a current financial statement.  Although the Defendant did not ask Redden to invest, the

Business Plan included a private placement memorandum and Redden assumed that was the

purpose of the visit.  (Day 4, Vol. 1, pp. 53-54)

27. Roberts and Mrs. Roberts agreed to invest in NFC.  (Day 1, Vol. 2, pp. 175-76; Day 3,

Vol. 2, p. 156)  In January 2002, they made their initial investment of $50,000.  Mr. and Mrs. Roberts

then made additional investments as needed to keep the company going.  (Day 3, Vol. 2, p. 198-199)

In total they invested $250,000-300,000.  (Day 3, Vol. 2, pp. 157, 197)

28. Redden invested $40,000 in NFC in February 2002.[12] (Day 4, Vol. 1, pp. 54-55)

---

[11]  Cybros was a company that made wheat and gluten-free bread.  According to the Defendant, Cybros was
going to sell wheat and gluten-free bread placing the NFC label on it.
[12]  Redden lent NFC $15,000 in October 2002 to purchase ingredients to manufacture pies.  (Day 4, Vol. 1, p.
57)

NFC in 2002

29. After Mr. and Mrs. Roberts made their initial investment, the Defendant hired them to work for NFC. (Day 1, Vol. 2, pp. 175-176) Roberts began work in January 2002 at a salary of $120,000 a year although he never drew a paycheck. (Day 3, Vol. 2, pp. 160, 162) The Defendant gave him the title of chief operating officer, and his duties were to oversee production and help sell the products. (Day 3, Vol. 2, pp. 160, 206; Day 4, Vol. 1, p. 4) Mrs. Roberts was originally hired to be a grant writer and then she became the officer administrator. (Day 1, Vol. 2, p. 177; Day 3, Vol. 1, p. 21; Day 3, Vol. 2, p. 163; Day 4, Vol. 2, pp. 194-195) Her salary was also to be $120,000 a year although she never drew a paycheck. (Day 3, Vol. 2, p. 162; Day 4, Vol. 2, pp. 195-196)

30. In early 2002, NFC's corporate office, including its corporate books and records, was moved into the Roberts' home in Dover. (Day 1, Vol. 2, pp. 177; Day 3, Vol. 1, p. 20; Day 3, Vol. 2, p. 163) The office was in a large room that had been the Roberts' den, and Mrs. Roberts worked out of a smaller office down the hall. (Day 3, Vol. 2, p. 163; Day 4, Vol. 2, p. 196) NFC's office in the Roberts' home was well-organized. (Day 4, Vol. 1, p. 6)

31. The Roberts' home was always open to the Defendant, who had access to the office at all times. Roberts and Mrs. Roberts often went to bed when the Defendant was still working in the office. (Day 3, Vol. 2, p. 174; Day 4, Vol. 2, pp. 197, 209)

32. On or about January 18, 2002, Roberts purchased an Apple Computer, Inc. ("Apple") iBook, Serial Number UV2030D4LLL (the "Laptop"). (Joint Pretrial Statement, Stipulated Fact #3; Day 3, Vol. 2, p. 166; Pl. Ex. 29.) He did so because the Defendant told him NFC needed one to keep track of its records. The Defendant specifically said that he wanted an Apple Laptop, and the Defendant ordered the one that he wanted using Roberts' credit card to pay for it. (Day 3, Vol. 2, pp. 166-167)

10

33. The Defendant used the Laptop for NFC business, and some of NFC's recipes were stored on the Laptop.  (Day 1, Vol. 2, p., 190; Day 2, pp. 48, 50)  According to the Defendant, recipes for apple pie, apple cranberry pie, blueberry pie, cherry pie, peach pie, pumpkin pie, chocolate mousse pie, chocolate pudding, pie shells, streusel dough, rice milk, key lime pie, lemon cream pie, and sponge cake were on the Laptop.  (Day 2, pp. 48 -51)  The Defendant said that pizza dough and shells, walnut torte cake, and chocolate brownie recipes were not on the Laptop.  (Day 2, p. 50)

34. Roberts watched the Defendant input into the Laptop recipes in a spreadsheet format that would scale the recipes for different size batches.  The Laptop was used by the Defendant when he supervised the manufacturing operations for NFC at the Phranil plant in Spokane, WA.  (Day 3, Vol. 2, pp. 167, 214)

35. The Defendant took the Laptop everywhere with him.  Roberts described it as the Defendant's "electronic notebook."  (Day 3, Vol. 2, pp. 167, 216)  The Defendant never left the Laptop in the office in the Roberts' home, even overnight.  (Day 4, Vol. 2, pp. 196-197)  The Defendant admitted that he and the Laptop were "inseparable."  (Day 6, Vol. 2, p. 235)

36. Included in the files maintained in the office in the Roberts' home was a manila folder with all of NFC's recipes, both those that were in production and those that were not.[13]  (Day 1, Vol. 2, pp. 185-186; Day 3, Vol. 1, p. 61; Day 3, Vol. 2, pp. 163-164; Day 4, Vol. 2, p. 198)

37. Roberts kept a separate blue folder with the Commercial Recipes for only the pies that were in production on his desk.  (Day 3, Vol. 2, p. 164; Day 4, Vol. 2, pp. 198-199)  That file remained on his desk, and contained the basic Commercial Recipes Naturally ME is presently using. (Day 3, Vol. 2, pp. 165-166)

---

[13] The Defendant testified that that folder with all of the recipes was blue.  Mrs. Roberts testified that it was manila, and that the folder with the pie recipes was blue.

38. Roberts looked through the manila folder and saw recipes for the fruit pies, as well as recipes for Boston cream pie, rolls, pizza dough, brownies, and walnut torte cake. He described the recipes as being typed, with ingredients and mixing instructions. (Day 3, Vol. 2, pp. 164-165) Mrs. Roberts also looked through that folder and saw recipes for the fruit pies as well as chocolate cake, pizza dough, and key lime pie. She described the recipes as being very detailed with measurements, blending instructions, and cooking instructions. (Day 4, Vol. 2, p. 199)

39. The last time Roberts and Mrs. Roberts saw the manila folder with all of the recipes was in September or October 2002. Although neither Roberts nor Mrs. Roberts saw him remove the file with the recipes, they believe that he did so, (Day 3, Vol. 2, pp. 211-212; Day 4, Vol. 2, p. 208), because the Defendant was taking files home from the office, some of which he brought back and some of which he did not. (Day 3, Vol. 2, pp. 165, 211; Day 4, Vol. 2, p. 201) There is nothing in the record to indicate that anyone else had access to this area.

40. The Defendant agreed that NFC's recipes were in a folder, typed up, in the office in the Roberts' home. (Day 2, p. 50) In fact, he said that the folder in the office contained the only set of NFC's recipes because he destroyed the other copies in the middle of 2002, "possibly" with Roberts. (Day 3, Vol. 1, pp. 121-122) Roberts denied that he destroyed any recipes with the Defendant. (Day 4, Vol. 1, p. 35)

41. The Defendant denied taking the folder out of the office in the fall of 2002. (Day 1, Vol. 2, p. 190; Day 3, Vol. 1, pp. 61-62) He testified that the last time he saw that folder it was in the Roberts' home. (Day 3, Vol. 1, pp. 61, 62)

Production at Phranil

42. In late 2001, NFC was making arrangements to have its pies manufactured by Phranil. Phranil was a family business owned by Fran Bessermin ("Mrs. Bessermin"). (Day 4, Vol. 2, p. 218) In December 2001, Roberts and the Defendant made a brief trip to Spokane so that Roberts could

12

meet Mrs. Bessermin and Craig Bessermin[14] ("Bessermin") and see the production facility. The

building was 50,000 square feet, and NFC occupied 2,000 square feet of production space. (Day 3,

Vol. 2, pp. 158-159; Day 4, Vol. 2, pp. 219, 223)

43. According to Bessermin, Phranil and NFC entered into a contract for Phranil to produce

pies in December 2001. Bessermin believed that the contract included production of wheat- and

gluten-free desserts, fruit pies, chocolate mousse pie, pumpkin pie, Boston cream pie, key lime pie

and pie shells for NFC.[15] (Day 4, Vol. 2, pp. 219-220)

44. The Defendant and Roberts went to the Phranil plant in early January 2002 to set up the

production line. (Day 1, Vol. 2, p. 176; Day 3, Vol. 1, p. 22; Day 3, Vol. 2, p. 159) Roberts spent six

weeks there on that task. He purchased manufacturing equipment and worked with Mrs. Bessermin

and Bessermin. (Day 3, Vol. 2, p. 159) The Defendant showed Bessermin, who was the general

manager at Phranil, how to make the pies. (Day 4, Vol. 2, pp. 217, 221)

45. The Defendant gave Bessermin the Commercial Recipes for the fruit pies, chocolate

mousse pie, pumpkin pie, and pie shells. Bessermin described the format of the Commercial

Recipes as having measurements for the ingredients, blending instructions, and cooking instructions.

(Day 3, Vol. 2, p. 217; Day 4, Vol. 2, pp. 221-222) He did not see recipes for the Boston cream pie

or the key lime pie although the Defendant told him that Phranil could start producing the Boston

cream pie in a two-week period and that the key lime pie would be easy to make as a spin-off of the

chocolate mousse pie. (Day 4, Vol. 2, pp. 224-225, 242, 248, 251-252)

46. NFC's Commercial Recipes which were kept internally were complete recipes minus

NFC's secret ingredient, TTP, with ingredients, mixing and baking instructions. The Defendant did

not provide those full recipes to NFC's production employees or the production employees for

---

[14] The Bessermins were never employed by NFC. (Day 3, Vol. 2, p. 160; Day 4, Vol. 2, p. 226)
[15] The contract between Phranil and NFC was not entered into evidence.

other manufacturers as he believed that it was very important to protect NFC's recipes and processes.[16]  (Day 3, Vol. 1, p. 119)

47. For all of the products, the Defendant omitted an ingredient he called "TTP" from each recipe.  (Day 4, Vol. 2, p. 221)  TTP was NFC's "secret ingredient" and the Defendant went to great lengths to keep the TTP secret.  (Day 3, Vol. 1, p. 110; Day 3, Vol. 2, p. 161)  When NFC started subcontracting production of its products, he kept TTP out of the recipes so the subcontractor would not have a complete recipe.  The Defendant believed that it was very important to protect the recipes and processes of NFC, so NFC shipped the TTP to the manufacturers.  According to the Defendant, Roberts was the only person he ever told the components of TTP.  (Day 3, Vol. 1, pp. 62, 110-111)

48. When pies were being produced at Phranil, the TTP was made in Dover and shipped to Spokane, unless the Defendant or Roberts were in Spokane.  (Day 3, Vol. 1, p. 111; Day 3, Vol. 2, p. 161; Day 4, Vol. 2, pp. 221-222)  Bessermin and the other Phranil employees were never given the components of TTP.  (Day 3, Vol. 1, p. 111)

49. In addition to the manufacturing space, NFC rented office space at Phranil.  (Day 2, p. 42)  NFC shared an office with Phranil, and had an office of its own.  Phranil had one or two computers that were occasionally used by the Defendant in the shared office.  (Day 2, pp. 43-44)  NFC also had a desktop computer which was made by a friend of Roberts and shipped to Spokane.  (Day 2, p. 43; Day 3, Vol. 2, pp. 172-173)  NFC did not use that computer very often because neither Roberts nor the Defendant were at the plant very often, and Roberts never arranged for Internet access.  (Day 3, Vol. 2, pp. 173, 216)  That computer did not have the recipes on it.  (Day 3, Vol. 2, p. 217)

---

[16]  Bolster noted that bakers who create recipes are "very attached" to them and "are famous for being paranoid."  (Day 1, Vol. 1, pp. 60, 81)

50. The Defendant brought the Laptop back and forth with him.  (Day 2, pp. 44-45; Day 4, Vol. 2, pp. 224, 226)  Roberts did not have access to and never used the Laptop because the Defendant had it with him all of the time.  (Day 2, Vol. 2 pp. 173-174)  The Defendant downloaded the Commercial Recipes for the products Phranil was producing from the Laptop onto Phranil's computer.  (Day 4, Vol. 2, p. 224)

51. The Defendant hired Richard Kunzig ("Kunzig") as NFC's VP of sales and marketing.[17] Kunzig and/or his company, RJK Enterprises, Inc., worked for NFC from November 2001 through October 2002.  During that time, he was in frequent contact with the Defendant, including on the weekends.  (Day 4, Vol. 2, pp. 129-130)

52. Kunzig had discussions with the Defendant about NFC's product mix and the list of products in the Business Plan.  The Defendant told Kunzig on several occasions that NFC had recipes for all of the products listed in the Business Plan, including the fruit pies and pie shells, chocolate mousse pie, Boston cream pie, key lime pie, lemon pie, brownies, chocolate cake, walnut torte cake, pizza dough and pizza shells, breakfast muffins, cake muffins, cookies, cakes, dry mixes and spice blends.  (Day 4, Vol. 2, pp. 118-122, 137)

53. Based on the information given to him by the Defendant, Kunzig began marketing NFC's products.  Kunzig prepared a report of the agreement he reached on behalf of NFC with River Valley Foods ("River Valley").  The report, which he submitted to River Valley, is dated February 2, 2002.  (Day 4, Vol. 2, pp. 124-125; Pl. Ex. 59)  The report includes a pricing chart for NFC's products including key lime pie and Boston cream pie.  Kunzig testified that the Defendant gave him the prices for all of the products on the chart.  (Day 4, Vol. 2, pp. 125-126)  The

---

[17]  Kunzig has no professional association with Naturally ME.  (Day 4, Vol. 2, p. 114)

Defendant denied that he told Kunzig what to put on the sell sheet.[18]   (Day 6, Vol. 2, p. 226)  The

purpose of a sell sheet is to tell distributors what a manufacturer is going to charge for its products.

54. NFC entered into a principal/broker agreement with Eclipse Sales and Marketing on

August 1, 2002.  (Day 1, Vol. 2, p. 211; Pl. Ex. 26)  Kunzig drafted the agreement.  (Day 4, Vol. 2, p.

128)  On the price list of products to be sold and approved by the Defendant was Boston cream pie

and key lime pie.  (Day 1, Vol. 2, p. 211; Day 4, Vol. 2, pp. 130-131; Pl. Ex. 26)  Based upon

conversations with the Defendant, Kunzig believed that these products could be produced

"immediately" if NFC had the manufacturing capability.  (Day 4, Vol. 2, p. 157)

55.   NFC also had a request form by which a broker could request samples to use in

demonstrations.  On a sample request form dated October 31, 2002, NFC listed Boston cream pie,

key lime pie, and chocolate cake.  Kunzig believed that those products were available for brokers to

use as samples.  (Day 4, Vol. 2, pp. 133-134, 154-155; Pl. Ex. 61)

56. The Defendant testified that the purpose of putting the Boston cream pie on the price

list was to "expose" it to see if it would be requested.  He testified that if enough customers

requested it, NFC would make it.  The Defendant testified that in his experience in the food

industry it is "normal practice" for sell sheets to contain products that a company does not have

readily available for sale at the moment as a way to gauge interest in the product.  If there was

sufficient interest, NFC would consider making the product.  (Day 1, Vol. 2, p. 211-212; Day 3, Vol.

1, pp. 47-48)

57. The Defendant testified that NFC ran into problems with distributors because it could

not fulfill orders at various times in its development because NFC experienced problems with

production output, not because it did not have recipes.  Despite those issues, he testified that he

---

[18]  The Court heard testimony from Kunzig and the Defendant on the same document in Pl. Ex. 59.  Kunzig
referred to it as a "pricing chart" and the Defendant called it a "sell sheet."  The Court finds that these terms
are interchangeable as they relate to Pl. Ex. 59.

gave a broker a sales sheet with products that NFC did not manufacture because it was common in the industry.  (Day 1, Vol. 2, pp. 212-213)

58. Kunzig disagreed.  He testified that he never would have included a product on a price list if NFC could not provide it because this practice would guarantee that NFC would never be able to "get back in the door" with that distributor.  (Day 4, Vol. 2, pp. 131-133)

59. The Defendant's expert witness, John Reilly ("Reilly"), testified that it would damage the company's relationship within the food industry to list items on a sell sheet that the company did not have and it is something a company would never do.  Reilly told the Court that everyone in the food industry, "top to bottom," understands that.[19]  (Day 6, Vol. 2, pp. 186-188)

60. Reilly said, after reviewing Defendant's Ex. 9, he has never worked for a company which publicized information it could not support.  (Day 6, Vol. 2, p. 176)  Defendant's Ex. 9 is a magazine article in *The Doctor's Prescription for Healthy Living*, Vol. 6, No. 5, pp.32-33 entitled "Gourmet Desserts . . . with a healthy difference!" written by Gloria Gilbere, ND, D.A. Hom., Ph.D. about NFC's products that says "[t]he pies are available in the following flavors: chocolate mousse, blueberry, cherry, apple, blueberry again, peach, Boston cream, key lime, pumpkin, raspberry.  There is also a walnut torte cake."  (D. Ex. 9)

61. Reilly assumed from NFC's order form dated August 30, 1998, which lists among the products available to be ordered non-dairy lemon and Boston cream pies, that those products were available for order.  (Day 6, Vol. 2, pp. 178-179; Pl. Ex. 72)  The order form also lists new products, including sponge cake, chocolate mousse, chocolate brownies, chocolate pudding, energy bar, walnut torte, muffins, and cranberry-apple muffins.  While Reilly did not believe those products

_____

[19] After listening to Reilly's testimony, the Defendant tried to blame David Krumm ("Krumm"), a one-time Vice President of Sales for NFC, for NFC's listing unavailable products on its sell sheets.  According to the Defendant, Krumm said to do it and if anyone ordered an unavailable product they should be told that NFC was "sold out."  (Day 6, Vol. 2, p. 203)  The Court does not find this attribution to Krumm by the Defendant credible.

were available for sale based on the wording of the order form, he did state that he would assume NFC had recipes for those products because the form lists the ingredients of each.[20]  (Day 6, Vol. 2, pp. 179-180)

62. The Court finds that Kunzig was credible and that there was no reason for him to lie. The Court finds the Defendant's testimony that it was a commonplace practice to market products a food manufacturer could not produce was not credible.

The "Dyer" Plan

63. The Defendant hired John F. Dyer ("Dyer") in the late spring of 2002 to provide corporate organization and direction for NFC.  (Day 3, Vol. 1, p. 23; Day 3, Vol. 2, p. 177)  Dyer did not have a previous relationship with the Defendant or Roberts.  Roberts did not introduce Dyer to NFC.[21]  (Day 3, Vol. 2, p. 224)

64. In late 2002, NFC was running out of money.  NFC's situation was critical and the Defendant had shown that he had problems with finances.  (Day 3, Vol. 2, p. 234)  The Defendant was continually approaching new investors who refused to invest because the financial affairs of the company were not in order.  (Day 3, Vol. 2, p. 226)  Roberts and Dyer were trying to get the company on track and make it profitable as quickly as possible, but NFC needed investors.  Roberts had learned that the Defendant had not filed tax returns for NFC.[22]  (Day 4, Vol. 1, p. 21)

---

[20]  This is especially significant because the Defendant was an expert in the food industry having worked on marketing for several companies prior to founding NFC.

[21]  Dyer is not involved with Naturally ME.  He is not a shareholder, officer, director or advisor.  Roberts has not had any contact with him for several years.  (Day 4, Vol. 1, pp. 22-23, 46)

[22] The Defendant told Roberts that NFC had hired Felix Betro ("Betro"), who is a CPA, to file the tax returns; however, when Roberts called Betro he found out that was not true.  Betro had done work for the Attridge family and was willing to try to get the company's taxes straightened out.  Betro was not an investor in NFC, although he is a creditor.  He is a shareholder of Naturally ME, and is its Chairman of the Board and Treasurer.  (Day 3, Vol. 2, p. 180; Day 4, Vol. 1, p. 108)

65. Phranil stopped manufacturing pies for NFC in November or December 2002 because of its own financial problems.  NFC was looking into other co-packing[23] arrangements to have the pies manufactured, and was in discussions with Nancy's Pies in Rock Island, Illinois ("Nancy's Pies").  (Day 3, Vol. 2, pp. 182-183; Day 4, Vol. 1, p. 22)

66. Dyer came up with a plan to reorganize NFC ("Dyer Plan") into a viable company.  (Day 3, Vol. 2, pp. 177, 226; D. Ex. 11)  Roberts encouraged the Defendant to agree to the Dyer Plan as he believed it offered NFC the best chance of being viable.  Roberts wanted NFC to continue as he had invested a great deal of money in the company and believed in the products.  (Day 3, Vol. 2, pp. 177-178)  Roberts and Dyer were trying to get NFC under control, not take control of the company. (Day 4, Vol. 1, p. 22)

67. Roberts, Redden, Dyer and Betro met with the Defendant on New Year's Eve 2002 in Betro's office to discuss the Dyer Plan.  (Day 3, Vol. 2, p. 179; Day 4, Vol. 1, pp. 59-60, 107)  They wanted NFC to keep going and the Dyer Plan seemed to them to be the best approach for everyone. The Defendant would be doing what he did best, which was being a chef and the spokesman, rather than dealing with the finances, which were a "mess."  He was to remain as the president and draw a salary.  (Day 3, Vol. 2, pp. 179, 235; Day 4, Vol. 1 pp. 60-61)  They discussed the Plan with him and incorporated his suggestions on how the company should be run.  (Day 3, Vol. 2, p. 237)  The Defendant agreed to the Dyer Plan during that meeting.  (Day 4, Vol. 1, p. 61)

68. The Defendant eventually signed the Dyer Plan, but not at that meeting as he wanted to talk it over with his wife.  (Day 3, Vol. 2, pp. 181, 238; Day 4, Vol. 1, pp. 62, 108)  He withdrew his assent after consulting with counsel.  (Day 3, Vol. 1, pp. 25-26)

---

[23] Co-packing is a term referring to the practice of having a manufacturer make products to be sold under another company's label.  (Day 1, Vol. 2, p. 171)  According to the Defendant, it does not necessarily have to be an outside manufacturer producing NFC's recipes.  Co-packing may also include NFC placing its label on another manufacturer's product.

69. After the Defendant signed the Dyer Plan, Roberts did not hear from him again. (Day 3, Vol. 2, p. 181)  Right after the first of the year (2003), the Defendant left and did not return Roberts' telephone calls or e-mails. (Day 3, Vol. 2, pp. 181-182, 238)  Roberts did everything he could to keep the business going, including shipping Internet orders and dealing with shippers and distributors. (Day 3, Vol. 2, p. 182)

The Involuntary Bankruptcy

70. On January 21, 2003, an involuntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code was commenced against NFC. (Joint Pretrial Statement, Stipulated Fact #7; Pl. Ex. 67, Doc. 1)  Roberts, Mrs. Roberts and Redden were three (3) of the ten (10) petitioning creditors.

71. Roberts participated in filing the involuntary for a number of reasons.  The Defendant had fired Dyer on January 3 or 4, 2003 (Day 3, Vol. 2, pp. 182, 238-239), and would not return Roberts' phone calls, faxes or e-mails.  Additionally, Roberts saw the Defendant leave his mother's house in a taxi with several suitcases.  Roberts found out that the Defendant had borrowed money from Charles Mailman ("Mailman") and had promised Mailman he would be repaid from NFC's receivables, although NFC did not have any receivables.  The Defendant had the phone in NFC's office in the Roberts' home turned off. (Day 4, Vol. 1, pp. 23-24)  Roberts understood the purpose of the involuntary proceeding was to allow NFC to continue to manufacture pies. (Day 3, Vol. 2, p. 184)  It was not his intent to form a new company.  Rather, he expected that NFC would go forward with the contract with Nancy's Pies. (Day 4, Vol. 1, p. 24)

72. Redden's purpose in participating in the involuntary petition was to have the bankruptcy estate go through with the contract with Nancy's Pies to build up the value of NFC. (Day 4, Vol. 1, pp. 63-64)  Additionally, he was concerned that the Defendant had fired Dyer and was not in communication with Roberts and Mrs. Roberts. (Day 4, Vol. 1, p. 109)

20

73. The Defendant fired Roberts on January 28, 2003. (Day 3, Vol. 2, p. 162) Mrs. Roberts found out on February 7, 2003 that she had been fired from a document NFC filed with the bankruptcy court. (Day 4, Vol. 2, pp. 202-203)

74. In February 2003, the Defendant retained Pamela Harbeson ("Harbeson"), a partner at Looney & Grossman, LLP to represent NFC in the bankruptcy proceeding.[24] (Day 2, pp. 4, 5-6)

75. When Harbeson was retained, the Defendant and Mrs. Attridge were asserting that they owned the intellectual property used by NFC, namely the trademark and all the recipes ("Intellectual Property"). (Day 2, pp. 6-7)

76. Relying on information she received from the Defendant, Harbeson filed a Motion to Dismiss the involuntary proceeding on the grounds that NFC was paying its debts as they became due. (Day 2, p. 6; Pl. Ex. 67, Doc. 27) Harbeson later learned, contrary to what the Defendant had told her, that NFC was not paying its debts. (Day 2, pp. 7-8)

77. NFC withdrew its Motion to Dismiss and an Order for Relief entered on April 15, 2003. (Joint Pretrial Statement, Stipulated Fact #7; Pl. Ex. 67, Doc. 51) The Defendant testified that he consented to the entry of the Order for Relief because "investors said they would purchase the assets." (Day 3, Vol. 1, p. 28)

78. The Defendant drafted budget and financial projections dated March 31, 2003 to use to solicit investors in NFC after the involuntary bankruptcy petition was filed. Included in the projections is a "product and sales mix" which listed key lime pie, Boston cream pie, and chocolate cake and pricing for various sales channels in addition to the fruit pies. The Defendant denied at trial that NFC had recipes for all of those products although he admitted that there are no disclaimers to that effect in the document. In the financial projection, the Defendant estimated the

---

[24] Harbeson testified at the trial pursuant to a waiver of the attorney-client privilege executed by the Chapter 11 Trustee. (Day 2, Vol 1, p. 4) The Court finds that Harbeson was a credible witness.

potential revenues for all the products listed in excess of $4 million for the first year. (Day 2, pp. 96-97; Pl. Ex. 31)

79. At the time NFC assented to the Order for Relief (April 15, 2003), the Defendant and Mrs. Attridge were still claiming that they owned the Intellectual Property. The Defendant gave Harbeson the information for the schedules and statements of affairs filed by NFC. (Day 2, p. 12) On Schedule B, NFC stated that it was the licensee of the trademark "Natural Feast" and certain proprietary recipes and other intellectual property owned by the Defendant and Mrs. Attridge. (Day 2, p. 13; Pl. Ex. 50) The Defendant and Mrs. Attridge planned to retain counsel individually and the ownership issue would be determined either through a declaratory judgment action or a sale of the assets. (Day 2, p. 8)

80. Harbeson represented NFC at a Rule 2004 examination of the Defendant[25] during which he testified that he had "voluminous" documents. (Day 2, p. 16) When the Defendant finally produced documents to her on a Sunday evening, he only turned over a stack of papers approximately an inch and a half thick. This did not comport with Harbeson's understanding that there were "voluminous" documents to be produced. (Day 2, p. 20)

81. Harbeson sent the Defendant an e-mail advising him of his obligation to turn over documents. In that e-mail, Harbeson stated that she had spoken with Fred Micale, a corporate attorney for NFC, who told her that the Defendant had determined that some of the documents in NFC's files were "harmful to his cause" and he therefore was not going to turn them over, in Harbeson's words, "in derogation of the Court's order." (Day 2, pp. 20-22; Pl. Ex. 53)

82. Harbeson filed a motion for leave to withdraw as NFC's counsel and a motion for an emergency hearing on the motion for leave to withdraw on May 23, 2003 because "there had been an irretrievable breakdown of the attorney/client relationship." (Day 2, p. 32; Pl. Ex. 56) The

---

[25] Harbeson represented NFC. She did not represent the Defendant personally. At the Rule 2004 examination, the Defendant was not represented personally.

22

Defendant was the only representative of the corporate debtor with whom Harbeson had any

contact and she did not believe the Defendant was being honest and truthful with her regarding the

information he was providing.  Additionally, Harbeson said at a hearing in connection with the

appointment of a Chapter 11 Trustee, she felt that the testimony that the Defendant gave before

Judge Kenner was not honest. (Day 2, pp. 32-33)  Harbeson could not recall specifically what the

Defendant told Judge Kenner that she felt was not honest.  (Day 2, p. 33)  The Court granted

Harbeson's motion for leave to withdraw as NFC's counsel on June 3, 2003.  (Pl. Ex. 67, Doc. 133)

Trumark Industries

83. During the spring of 2003, the Defendant went back and forth to Spokane to meet with

Jack Brace ("Brace") to negotiate a potential sale of certain of NFC's assets to Brace's company,

Trumark Industries ("Trumark").  Trumark operated out of a building next to the Phranil plant, and

Brace had built the Phranil plant.  The Defendant also met with Mrs. Bessermin and Bessermin

during those trips.  (Day 2, pp. 46-47)

84. Kunzig went with the Defendant to one of the meetings with Brace.  He also met with

the Defendant and other potential investors, including Tim Hawkes and Doug Morgan.  The

Defendant took the position during discussions with those potential investors that he and Mrs.

Attridge owned the recipes.  (Day 4, Vol. 2, pp. 141-143)

85. Kunzig helped the Defendant draft letters to Brace regarding Trumark's possible

purchase of NFC's assets, which he provided to the Defendant by e-mails dated April 6, 2003.  The

Defendant gave him the information that he put into the draft letters.  (Day 4, Vol. 2, pp. 143-146;

Pl. Exs. 32 and 33)  In both drafts, the Defendant represented that he and his wife owned the

trademark, and that the "complete ownership of the recipes and manufacturing processes is in a

proverbial cloud."  Additionally, the Defendant stated in both drafts that the planning budgets

provided for the roll-out of "Pies and Cakes" because they were the "most profitable." (Day 4, Vol. 2, pp. 146-147; Pl. Exs. 32 and 33, emphasis supplied in Pl. Ex. 32)

86. NFC entered into an agreement to sell certain assets to Trumark for $75,000, which was contingent upon Trumark entering into a licensing agreement with the Defendant and Mrs. Attridge for the Intellectual Property. (Day 1, Vol. 2, pp. 196-197; Day 2, pp. 8-9, 11; Pl. Ex. 49) On April 30, 2003, NFC filed a motion to sell those assets to Trumark.[26] (Pl. Ex. 49)

The Chapter 11 Trustee

87. On or about May 13, 2003, the Court approved the appointment of a Chapter 11 Trustee. (Pl. Ex. 67) After the Trustee was appointed, Harbeson told the Defendant that all of NFC's assets were then owned by the Trustee and that he needed to turn over all assets and documents to the Trustee forthwith. (Day 2, p. 23) Harbeson understood that the corporate records were scattered throughout the state and she instructed the Defendant to pull all records together in one or two places. She believed he was going to put the documents in the self-storage facility in Foxborough and the trailer in Allston. (Day 2, p. 23) The trailer in Allston was stored at the ROMAC facility. The trailer had been used off and on over several years for storage by NFC whenever the company was not in production. The Defendant did not talk to Harbeson about putting any assets in a warehouse. (Day 2, p. 24) Harbeson believed that NFC's tangible assets, which consisted of some shelving and packaging as well as a laptop and a hard drive computer, were going to be turned over to the Trustee. (Day 2, p. 24)

88. The Section 341 meeting in the NFC case was held on May 22, 2003 (Day 2, p. 27; Pl. Ex. 54), and the Defendant testified on behalf of the Debtor. (Day 1, Vol. 1, p. 16; Pl. Ex. 54) At the time the Trustee was appointed and at the Section 341 Meeting, the Defendant asserted that he and his wife owned the Intellectual Property including all recipes. (Day 1, Vol. 1, p. 17; Day 2, pp.

---

[26] The Trustee later withdrew that motion to sell. (Day 1, Vol. 1, p. 32; Pl. Ex. 67)

25, 27; Pl. Ex. 54)  The Defendant testified that the recipes as well as certain information printed from NFC's computer were in a trailer in Allston.  He also testified he had at his home some computers and disks on which there was information about NFC.  (Day 1, Vol. 1, pp. 18-20; Day 2, pp. 28-29; Pl. Ex. 54)

89. The Defendant testified that he had copies of all of the recipes until, the Trustee, Jonathon Yellin, took control and then everything was delivered to the trailer in Allston to which the Trustee had access.  (Day 2, p. 51)  Yellin said that there was nothing in the documents he retrieved from the trailer in Allston that looked like recipes.  (Day 1, Vol 1, p. 30)

90. Roberts went to the trailer in November 2002 at the Defendant's direction to retrieve financial documents that the Defendant told him would help get NFC's finances in order.  He did not see any recipes in the trailer.  He brought back two file cabinets to his home.  (Day 3, Vol. 2, pp. 191-192)  Roberts and Mrs. Roberts gave those file cabinets back to the Defendant after the order for relief was entered.  (Day 3, Vol. 2, p. 192; Day 4, Vol. 2, p. 203)

91. After the involuntary bankruptcy was filed, Roberts moved the corporate records that had been in his home to the Guardian Self-Storage in Foxborough ("Foxborough facility") at the recommendation of the attorney who was then representing the petitioning creditors.  (Day 3, Vol. 2, p. 194)  Neither party asserted that the recipes for NFC were stored at the Foxborough facility.

92. After the Order for Relief entered, Roberts and Mrs. Roberts turned over the assets and records of NFC that they had in their home.  (Day 2, pp. 18, 55; Day 3, Vol. 2, p. 190; Pl. Ex. 52).  Included in the items that they turned over by letter dated April 25, 2003 was a key to the Foxborough facility.  (Day 2, p. 18-20; Pl. Ex. 52)

93. On or about May 1, 2003, Roberts turned over to the Defendant the following assets of NFC which were in the Roberts' home:

    a.   Scale;

      b.   Credit card machine;
      c.   Two Rubbermaid containers with documents;
      d.   Labels for the pies;
      e.   Styrofoam inserts;
      f.   11 packages of pie shells; and
      g.   A white cold storage container used to transport frozen pies.
(Day 3, Vol. 2, p. 190; Joint Pretrial Statement, Stipulated Fact #12.)

94. The Defendant testified that these were taken to the trailer in Allston. (Day 2, Vol. 1, pp. 56-57) He testified that he went to the trailer three or four days later and he saw the boxes, racks, file cabinets, desks, refrigerators, Styrofoam containers and three or four pallet jacks all "neat" and "sorted" in the warehouse. He testified that the paperwork was in the warehouse. (Day 2, Vol. 1, pp. 57-58) He also testified that there was a credit card machine and an old printer in the warehouse. (Day 2, Vol. 1, p. 61)

95. After the Section 341 Meeting, Yellin went to the trailer in Allston. After some difficulty, he found the trailer in what he testified was a "trailer park." He was unable to open the lock on the trailer and had to call a locksmith to open it for him as well as replace the lock. After some difficulty opening the door to the trailer, Yellin was able to get in. He described the inside of the trailer as a "mess" with "paper strewn all throughout." He also saw a rat or mouse running in the back and described what was in the trailer as "garbage." Yellin removed all of the paperwork, including some labels, from the trailer and put them in his car. He did not see any computers. (Day 1, Vol. 1, pp. 21-23, 33.)

96. After locking the trailer, Yellin went into the office at the facility, which was around the corner from the trailer, to see if there were any materials relating to NFC in there. He saw a man and a woman in the office, which he described as "very smokey." The man and woman were drinking beer. He introduced himself to the man whose name he did not remember. The man pointed to a pile which was in a section of the office and said those items belonged to NFC. Yellin

testified that there were chairs and tables in the pile, but nothing of value.  He did not see any laptop

computers.  (Day 1, Vol. 1, pp. 24-26)

97. Yellin testified that the pile of NFC's belongings were not in a separate locked area, but

were in the office up against a wall.  (Day 1, Vol. 1, p. 27)  He testified that there were other piles in

the office, but they were not identified to him as belonging to NFC.  (Day 1, Vol. 1, p. 29)

98. Edward Foley ("Foley") had a somewhat different version of events.  He worked at the

ROMAC facility from 2002-2004.  (Day 6, Vol. 1, p. 62).  He agreed that Yellin had to call a

locksmith to get into the trailer, which he described as being in the yard, as opposed to up against

the warehouse.  (Day 6, Vol. 1, pp. 76-78)  He testified that the pallet jacks, file cabinets, a large

wooden crate and a credit card machine were picked up from the Roberts' house and brought to the

warehouse.  There was no laptop computer.  (Day 6, Vol. 1, pp. 64, 74-75)  He testified that Yellin

went through the trailer and he showed Yellin all of NFC's property in the warehouse.  (Day 6, Vol.

1, pp. 63-64)  He did not smoke at the time, and was not smoking when he met with Yellin.  Foley

testified that NFC's property was at the second, third and fourth loading dock doors.  (Day 6, Vol.

1, p. 71)

99. Yellin or someone in his office went through the records he took from the trailer in

Allston and there were no recipes.  (Day 1, Vol. 1, p. 30)

100.    Yellin filed a notice of intent to abandon the items that he did not remove from the

trailer and office in Allston.  (Day 1, Vol. 1, p. 30; D. Ex. 12)  The Defendant claimed he did not

know about the abandonment.  (Day 2, p. 66)  When Foley received the notice, he cleaned out the

trailer and threw everything out.  (Day 6, Vol. 1, pp. 66-67)

101.    After the Trustee abandoned the assets, Roberts received permission from the

Trustee to go to there to see if there was anything of value.  (Day 3, Vol. 2, p. 192; Day 4, Vol. 1, p.

31)  On or about July 6, 2003, he went to the location in Allston and found that the trailer was

completely empty and was backed up against the warehouse. (Day 3, Vol. 2, p. 193; Day 4, Vol. 1, pp. 15, 36) Roberts walked right into the warehouse and did not see anyone around. He did not see anything that he recognized as belonging to NFC. (Day 3, Vol. 2, p. 193; Day 4, Vol. 1, pp. 36-37)

102.    Sometime after July 7, 2003, the Defendant, who was then living in California and stated he had just learned of the abandonment, (Day 2, p. 66; D. Ex. 12), but was also interested in purchasing NFC's assets from the Trustee, appeared at the ROMAC warehouse and learned from Foley that all NFC property had already been disposed. Foley testified that the Defendant's reaction to the news was to say "I wish I knew" and that he was disgusted and depressed. (Day 6, Vol. 1, pp. 73-74)

103.    Roberts and Mrs. Roberts did not return to the Foxborough facility until July 6, 2003, after the Trustee had given them permission to do so. (Day 3, Vol. 2, pp. 194-195; Day 4, Vol. 2, p. 213) Roberts did not have the key at that time, so he had to cut off the lock. (Day 3, Vol. 2, p. 195; Day 4, Vol. 1, p. 14)

104.    On June 12, 2003, the Trustee filed an adversary complaint (the "Trustee's Complaint"), Adversary Proceeding No. 03-1233, against the Defendant and Mrs. Attridge seeking declaratory relief that the Intellectual Property was owned by NFC and not by the Defendant and Mrs. Attridge. (Joint Pretrial Statement, Stipulated Fact #9; Day 1, Vol. 1, p. 30)

105.    By Stipulation and Entry of Judgment dated June 27, 2003, the Trustee, the Defendant and Mrs. Attridge agreed to the entry of judgment in favor of the Trustee on all of the Counts in the Trustee's Complaint. (Joint Pretrial Statement, Stipulated Fact #10; Day 1, Vol. 1, pp. 34-35.)

106.    By Final Judgment dated July 7, 2003, this Court entered Judgment against the Attridges and permanently enjoined them as follows (the "Permanent Injunction"):

> . . . the Defendants Alan Attridge and Nina Fishman Attridge hold no
> ownership or other interests in the Recipes[27] or Trademark, and are
> permanently enjoined from using, concealing from the Trustee, disclosing,
> communicating with respect to, or entering into any assignment, sale,
> transfer, lease hypothecation or licensing of either the Recipes or the
> Trademark.

(Joint Pretrial Statement, Stipulated Fact #11.)

Naturally ME

107.    Naturally ME ("Plaintiff") was incorporated on August 8, 2003.  (Day 4, Vol. 1, p. 66; Plaintiff's Ex. 58)  Roberts is its president.  (Day 3, Vol. 2, p. 139)  Roberts, Mrs. Roberts and Redden own shares of Naturally ME.  The Plaintiff has a seven person Board of Directors.  Roberts, Mrs. Roberts and Redden are on the Board.  (Day 4, Vol. 1, pp. 45-46; Day 4, Vol. 2, p. 192)

108.    It was Redden's idea to form a company to purchase NFC's assets from the bankruptcy estate.  (Day 3, Vol. 2, p. 185; Day 4, Vol. 1, p. 66)  He suggested purchasing the assets only after the Trustee declined to go forward with the production contract with Nancy's Pies or to give Redden and his group an exclusive license for the recipes.  (Day 4, Vol. 1, p. 66)

109.    Redden crafted the Plaintiff's offer to purchase NFC's assets.  (Day 4, Vol. 1, p. 67; Pl. Ex. 68)  He explained the components of the Plaintiff's offer during his testimony.  (Day 4, Vol. 1, pp. 68-73)  Redden recognized that the Plaintiff's offer was below the fair market value of NFC's assets.  (Day 4, Vol. 1, p. 73)  He knew there were other interested parties and therefore structured the offer in a way that if a competing bidder prevailed, that bidder would have to put sufficient value into the company to repay his group for some of their expenses and they would receive some benefit as creditors.  (Day 4, Vol. 1, pp. 79-80)

---

[27]  "Recipes" were defined in the Court's Order as "the recipes, formulas and proprietary manufacturing processes used by the Debtor at any time pre-petition or post-petition."  In a subsequent objection to the sale of the assets of NFC to the Plaintiff, the Defendant claimed that "[t]he definition of the 'Recipes' in the Trustee's papers is overbroad."  He stated the definition for recipes did not include "generally all . . . 'know how, trade secrets, and other proprietary information'" nor did it include "formulas related . . . to certain (unspecified) wheat free . . . gluten free . . . non-hydrogenated oil products."  (Pl. Ex. 57)  On November 24, 2004, the Court overruled the Defendant's objection.  (D. Ex. 16)

The Sale of the Assets of NFC

110.    Yellin filed a notice and motion to sell NFC assets to the Plaintiff on October 7,

2003.  (Day 1, Vol. 1, p. 32; Pl. Ex. 68)

111.    The Defendant filed an objection *pro se* to the Trustee's Motion to Sell the Assets to

the Plaintiff dated November 13, 2003.[28]  (Day 2, p. 68; Pl. Ex. 57)  The basis for his objection was

that "the trustee is not describing the assets and intellectual property owned by the debtor correctly

in his papers."  The Defendant went on to state:

> The definition of the "Recipes" in the Trustee's papers is overbroad.  (see
> motion papers of the Trustee referring to "… the estate rights, title and
> interest in and to any recipes, formulas and proprietary know how").  When I
> and my attorney Gregory Oberhauser made our stipulated agreement in July to
> the Trustee and Ellen Carpenter, Esq. in whole to include the deposition as
> part of this agreement which articulated only the Pie Recipes were involved
> (sic).  It DID NOT include generally all… "know how, trade secrets and other
> proprietary information" and it DID NOT include "…formulas related to
> …certain (unspecified) wheat free…gluten free…non-hydrogenated oil
> products.  (emphasis supplied)

112.    The Defendant claimed that the Trustee could only sell the pie recipes.

113.    Hawkes and Associates filed a counteroffer.  (Pl. Ex. 67, Doc. 240)

114.    The Court disqualified Hawkes and Associates' counteroffer and overruled all of the

objections to the sale, including the one filed by the Defendant.   (Pl. Ex. 67, Docs. 247, 248; D. Ex.

16)

115.    By Order[29] of Judge Kenner ("Sale Order") and Bill of Sale dated November 24,

2003 ("Bill of Sale"), the Trustee sold and the Plaintiff purchased all of the assets of the Debtor

---

[28]  During trial, the Defendant testified that he did not recall if he filed an objection to the sale and denied
attending the hearing on the motion to sell.  He only agreed that he had filed an objection and attended a
hearing after his recollection was refreshed.  (Day 2, p. 67)  In response to a question from his own attorney
the very next day, the Defendant claimed to not recall whether he filed an objection to the sale.  (Day 3, Vol.
1, p. 30)
[29]  The Order stated:
> "The Court ruled that the counteroffer of Hawkes & Associates is stricken due to its failure
> to appear at the scheduled hearing today.  The Court overruled the objections of Charles

including all of the recipes, the Trademark and the estate's Machinery and Equipment wherever

located.   (Joint Pretrial Statement, Stipulated Fact #13; Pl. Ex. 67, Doc. 248; D. Ex. 16.)  NFC's

equipment included an angel pie press and a Shanklin automatic wrapper and sealer.  (Day 4, Vol. 1,

pp. 9-10, 94)  The Plaintiff also purchased NFC's customer list.  (Day 4, Vol. 1, pp. 10-12)

<u>The Laptop</u>

116.    The last time Roberts saw the Laptop was when the Defendant left the Roberts'

home in December 2002 and took it with him.  (Day 3, Vol. 2, p. 168)

117.    On February 3, 2003, after the involuntary proceeding was filed against NFC and

after the Defendant fired Roberts from his position at NFC, the Defendant took out an Apple Care

and Protection Plan on the Laptop.  (Day 1, Vol. 2, pp. 189-190; Day 2, pp. 86-87; Pl. Ex. 29)

118.    Roberts notified Apple Computers that the Laptop was missing in the event Apple

received any information on its whereabouts.  (Day 3, Vol. 2, pp. 187-188; Joint Pretrial Statement,

Stipulated Fact #5.)  In March 2004, Roberts received a call from Apple saying that someone had

called for service on the Laptop.  (Day 3, Vol. 2, pp. 188-189)

119.    The Defendant testified that he left the Laptop at the Phranil plant in March or April

2003, and when he went back to get the Laptop it was gone.  He claimed to have asked Brace about

it and Brace told him the plant had been broken into and there had been a flood.  The Defendant

did not file a police report for the missing Laptop.  (Day 1, Vol. 2, pp. 193-194, 197-198)

120.    He also testified that he left the Laptop in Spokane in "Spring of 2003, … or August,

July sometime."  (Day 6, Vol. 1, p. 193)  He further testified that his last trip to Spokane was in

2003.  The Defendant told the Court that he left the Laptop at the Phranil plant because he thought

---

Mailman, Alan Attridge and John Dyer and allowed the motion to sell to Naturally ME, Inc.
for the reasons stated on the record.  At the request of Atty Braunstein, the Court noted that
the Trustee and Buyer's Counsel agree that the sale to Naturally ME, Inc. is viable even in
the event of conversion and that a Chapter 7 trustee would have the same enforceable rights
as the Chapter 11 Trustee."  (D. Ex. 16)

Brace was going to "make an offer to buy the assets in a month or two" and they would resume

production in Spokane.  (Day 6, Vol. 2, pp.235-236)  He claimed he did not have another laptop for

about three months.  (Day 6, Vol. 2, p. 237)

121.    The Defendant said he looked for the Laptop at the Phranil Plant in "June, July, May

or April, around then… sometime after Mr. Yellin was appointed Trustee."  (Day 2, p. 48)  The

Court found this testimony shocking considering (1) the Defendant said that some of the recipes

were on the Laptop (Day 1, Vol. 2, p. 190; Day 2, pp. 48, 50); (2) at the time the Defendant was

claiming that he owned the recipes with his wife; (Day 2, p. 9); and (3) the Defendant had admitted

that he and the Laptop were "inseparable."  (Day 6, Vol. 2, p. 235)

122.    The last time Bessermin saw the Defendant prior to the trial in this matter was in

Spokane in the fall of 2003.  The Defendant told Bessermin about NFC's bankruptcy proceeding

and that he was in Spokane seeking investment financing from Brace.  (Day 4, Vol. 2, pp. 227-228)

Bessermin drove the Defendant to the airport and saw that he had a laptop computer with him.

(Day 4, Vol. 2, p. 228)

123.    The last time Roberts was at the Phranil Plant was in March or April of 2004.  (Day

3, Vol. 2, p. 175)  He met with Brace, who had purchased the building, to discuss the NFC

equipment that the Plaintiff had purchased.  Roberts went into the office that NFC had used at the

Plant.  He did not see any computer.  All that was left were some flyers and sell sheets.  (Day 3, Vol.

2, p. 176)

124.    The last time Bessermin was in the office that NFC had used at Phranil was in the

summer of 2004.  He did not see a laptop in that space, nor did the Defendant ever call and ask him

to look for a laptop for him.  (Day 4, Vol. 2, pp. 228-229)

125.    The Defendant testified during the second day of this trial on January 10, 2006 that

he had no laptop (Day 2, p. 94); however, on the last day of trial he appeared with one which he said

was the one Bessermin saw him carrying in the fall of 2003 and which the Defendant claimed was
not the Laptop.  According to the Defendant, this laptop, which was similar to the one Roberts'
purchased, was owned by Elliot Hoffman ("Hoffman").  (Day 6, Vol. 2, pp. 192-193)

126.    The Defendant said he used Hoffman's laptop, although he did not remember when
he started using it.  He testified he was using Hoffman's computer in August 2003.  (Day 2, p. 92)
He also said Hoffman gave the laptop to him sometime in 2003 although at other points in his
testimony he said Hoffman had only lent it to him.  (Day 6, Vol. 2, p. 214)

127.    The Defendant admitted calling Apple after he took out the Care and Protection
Plan in February 2003.  He testified that he called Apple four or five times under the Care and
Protection Plan because he was trying to fix Hoffman's daughter's computer.  (Day 1, Vol. 2, pp.
198-199)  The Defendant also claimed he called Apple about the laptop from Hoffman.  (Day 6,
Vol. 2, p. 214)  He claimed that he also called Apple about another of Hoffman's computers that
was in Hoffman's house and that he stayed with Hoffman for a week at a time.  (Day 6, Vol. 2, pp.
214-215) The Defendant did not purchase a care and protection plan for Hoffman's computer.
(Day 2, p. 93)  The Court notes that Hoffman did not testify at the trial.

The Missing Recipes[30]

128.    The Defendant wrote many memoranda to NFC's Board and shareholders.  He also
wrote many business plans.

129.    In a memo dated January 23, 1995, the Defendant told NFC's Board that there are
"six (6) pies now in 'pilot manufacturing.'"  "Apple, cherry, lemon cream, pumpkin and blueberry."
(Day 1, Vol. 1, p. 107-108; Pl. Ex. 1)

---

[30]  The Missing Recipes are those recipes of which the Court, upon significant evidence and testimony, finds
exist or existed and were owned by NFC but not delivered to the Plaintiff.  Specifically these are:  Boston
cream pie, non-dairy lemon pie, key lime pie, walnut torte cake (which includes carrot cake, chocolate cake,
and muffins), pizza dough, and brownies.

130.    In an Executive Summary of a business plan for NFC in 1995, the Defendant stated that NFC planned to introduce pie crusts, cookies, bread mixes, breakfast tarts, breads, vegetable pies, and cakes over the next three years.  (Day 1, Vol. 1, p. 116; Pl. Ex. 4)

131.    In 1995 NFC had a pro forma, for prospective investors to review.  The pro forma listed the following products:  apple pie, blueberry pie, lemon cream pie,[31] peach pie, cherry pie, pumpkin pie, mixes, chocolate bar, bagels, muffins and pie crusts, with the suggested selling prices for each product.  (Day 1, Vol. 1, pp. 118-121; Pl. Ex. 5)

132.    The Defendant drafted a memo to NFC's "shareholders and friends" dated February 23, 1997.  In the memo, he discussed the Natural Products West Expo, a food show he planned to attend to show NFC's products.  He reported that NFC was going to introduce "great tasting, fat-free, dairy-free, refined sugar-free, and wheat- and gluten-free brownies at the show and Star Market stores in Massachusetts."  (Day 1, Vol. 1, pp. 121-124; Pl. Ex. 6)

133.    In a memo dated August 14, 1996, the Defendant reported to NFC's shareholders that  "In addition to the established pie product line of apple, blueberry, peach, cherry, lemon, and pumpkin in September, we will start introducing to only Bread & Circus and Wild Harvest markets apple-cranberry pie, Boston cream pie, chocolate mousse pie, pie shells, sponge cake, walnut torte, chocolate brownies, butterscotch brownies, chocolate pudding, vanilla pudding, lemon pudding, chocolate mousse, bread, English muffins, energy bars, protein bars, tapioca flour, potato flour, bread machine mix and processed fruit."  (Day 1, Vol. 1, pp. 127-128; Pl. Ex. 7)

134.    By letter dated September 20, 1996, NFC made an insurance claim through its agent, Paul Attridge, who is the Defendant's uncle, for spoilage of certain products as the result of a freezer breakdown.  The Defendant signed the insurance claim.  On the insurance claim, NFC listed

---

[31] Lemon cream pie and lemon pie were used interchangeably by the parties.  The Court is going to use the term lemon pie, except when quoting directly from an exhibit or testimony that refers to lemon pie as lemon cream pie.

the products that were spoiled, together with the manufacturing costs and wholesale sale costs of each product. NFC made a claim for ruined lemon cream pies, sponge cakes and walnut torte cakes. (Day 1, Vol. 2, pp. 138-139; Pl. Exh. 8) He admitted that NFC made lemon cream pies, sponge cakes and walnut torte cakes. (Day 3, Vol. 1, p. 103; Pl. Ex. 8)

135.    NFC had a UPC Code for brownies. A UPC code allows a retailer to scan a product and charge the appropriate price to the consumer as well as tracking the inventory for the product. (Day 1, Vol. 2, p. 143; Pl. Exh. 10) Before a product is sold in a retail market it must have a UPC code. (Day 1, Vol. 2, p. 144; Day 4, Vol. 2, p. 136)

136.    NFC had a sell sheet with an effective date of September 20, 1998. Included on the sell sheet were Boston cream pie, lemon dairy, pumpkin non-dairy, pumpkin dairy, chocolate brownies. NFC intended that a distributor would decide from this list which products it wanted to purchase. (Day 1, Vol. 2, pp. 144-145; Pl. Ex. 11)

137.    NFC had a form "Production Report" dated November 7, 1998. Included on the Production Report as products manufactured by NFC were lemon pies (dairy and non-dairy), Boston cream pie, sponge cake, protein bars, butterscotch brownies, chocolate brownies, English muffins, rice raisin bread and bread mix. (Day 1, Vol. 2, pp. 145-146; Pl. Ex. 12)

138.    The Defendant participated in drafting what he called a "corporate backgrounder" issued by NFC. The corporate backgrounder stated: "In addition to its line of natural fruit pies, Natural Feast is expanding its line of foods. New products include energy bars, low-fat brownies, and chocolate mousse pie." The corporate backgrounder also said that energy bars, chocolate mousse pie, brownies, breads and muffins and snacks would soon be available. He testified that the statement in the corporate backgrounder was accurate. (Day 1, Vol. 2, pp. 147-148; Pl. Ex. 13)

139.    An agenda for a NFC Board meeting on July 13, 1999 stated that NFC will start manufacturing Boston cream pies one to two days a week. The Defendant stated NFC had a recipe

for Boston cream pie at that time and was ready to start manufacturing it. (Day 1, Vol. 2, pp. 148-150; Pl. Ex. 15)

140.    At a Board meeting on August 8, 2000, Board member Perry Boudreau urged NFC to immediately start to manufacture Boston cream pies. (Day 1, Vol. 2, pp. 19-20; Pl. Ex. 16)

141.    In a memo to the NFC Board dated July 7, 2000, the Defendant reported that he had trained the personnel at Mother Nature's Goodies to make the fruit pies and pie shells and was ready to begin training the personnel to manufacture chocolate mousse, key lime and Boston cream pies. At trial he testified that the recipes for the products on which he was to begin training were incomplete and he was four to six months away from having those products produced but he did not report that to the Board in his memo, although he acknowledged that he knew it was important to be truthful in all of his communications with the Board. (Day 1, Vol. 2, pp. 153-154; Pl. Ex. 17)

142.    In a memo dated August 6, 2000, the Defendant reported that agreements had been signed with two subcontractors to manufacture the pies and discussions were on going with manufacturers to make bread and muffins. He testified that the information in that memo was accurate. (Day 1, Vol. 2, p. 156; Pl. Ex. 18)

143.    NFC was interested in expanding into the food services market. The Defendant prepared a chart dated April 10, 2002 of products, including Boston cream pie and key lime pie, to take to food services companies. (Day 1, Vol. 2, p. 205; Pl. Ex. 23)

144.    NFC had a business plan dated August 2002 which describes the products it had developed as but not yet begun to produce and market: "Dry pie mixes, cakes, breads, bread mixes, breakfast muffins, cake muffins, pizza crust, ice dinners, organic spice blends, cookies, and crackers." The Defendant testified that the description of the products NFC had developed was accurate, although he then testified that the description was inaccurate as NFC was going to use products manufactured by others. (Day 1, Vol. 2, pp. 208-210; Pl. Ex. 25)

36

145.    Gloria Gilbere ("Dr. Gilbere") is a physician who is very well respected author in the natural products world.   Dr. Gilbere mentioned NFC in her book *Invisible Illnesses*, which was copywrited in 2002.  Dr. Gilbere reported that the pies were available in chocolate mousse, blueberry, cherry, apple, Boston cream, key lime, pumpkin, walnut torte, raspberry, peach, and there was also a walnut torte cake.  She obtained that information from NFC.  (Day 1, Vol. 2, pp. 215-217; Pl. Ex. 28)

146.    Under a photo accompanying an article about celiac disease in *The Doctor's Prescription for Healthy Living,* "Gourmet Desserts . . . with a healthy difference!," Vol. 6, No. 5, pp.32-33, the caption reads that NFC's pies are available in the following flavors: chocolate mousse, blueberry, cherry, apple, blueberry again, peach, Boston cream, key lime, pumpkin, raspberry, and walnut torte cake.  (D. Ex. 9)

147.    The document trail continued after the involuntary petition was filed.  As discussed above, the Defendant drafted budget and financial projections dated March 31, 2003 to solicit investors in NFC.  Included in the projections is a "product and sales mix" which listed (in addition to the fruit pies) key lime pie, Boston cream pie, and chocolate cake.  (Pl. Ex. 31)

148.    In addition to the written descriptions of NFC's products, the Defendant also made a variety of wheat- and gluten-free products.  He made chocolate cake and pizza for Roberts and Mrs. Roberts using NFC's recipes.  (Day 1, Vol. 2, p. 53)  He also made pizza at the Roberts' home once or twice and once for a meeting of the Board of Directors.  (Day 3, Vol. 1, p. 51; Day 3, Vol. 2, p. 170)  Redden also ate pizza made by the Defendant.  (Day 4, Vol. 1, p. 56)

149.    The Defendant states that the only products NFC ever sold were fruit pies, chocolate mousse pie, pumpkin pie and pie shells, and Naturally ME has recipes for those products.

He introduced testimony from Mailman, Debra Chandler[32], Roosevelt St. Louis[33] and Paul Tilton[34] all to the effect that NFC only sold fruit pies.  Ms. Chandler, Mr. St. Louis, and Mr. Tilton acknowledged that they never saw the sell sheets or the business plans of NFC.  Additionally, these three individuals were involved early in NFC's history and they had limited knowledge regarding the overall goals of NFC; therefore their testimony was not helpful to the Court.  Finally, the Court finds that their testimony on what products NFC sold is irrelevant because it is not whether the product was actually sold that determines whether NFC had a recipe for that product.

150.    NFC never commercially produced a Boston cream pie but had made a number on a few occasions, including some which were donated to Children's Hospital for parties involving celiac children.  On one such occasion, left over Boston cream pies without commercial packaging were sold to a Rhode Island health food store owner who was in attendance.  (Day 3, Vol. 1, pp. 40-41)

151.    The Defendant agreed that NFC had recipes, although not necessarily recipes for commercial production, for the following products in addition to the fruit pies and pie shells: pumpkin pie, chocolate mousse pie, chocolate cake, walnut torte cake, chocolate brownies, sponge cake, pizza dough, key lime pie, lemon pie (Day 2, Vol. 1, pp. 49-51) and Boston cream pie (Day 1, Vol. 1, p. 130).  (See also Day 1, Vol. 1, p. 110, 113, 124-125, 129; Day 3, Vol. 1, pp. 106-107)

152.    Based on the documentary evidence, the sell sheets and the labels, as well as the testimony given by the Defendant, the Defendant's witnesses, the Plaintiff's witnesses, and the

---

[32] Debra Chandler was employed by NFC part time from around 1997 to 2000 helping with pie demonstrations and with some sales.  She was not a shareholder and did not help produce or create the pies. (Day 6, Vol 1, pp. 5, 7, 9)
[33] Roosevelt St. Louis was a subcontractor for NFC from around 1995 or 1996 to 1997.  He produced pies and put them in the freezer in Stoughton, MA.  He was never at the New Bedford facility or the Woburn facility.  He was never a shareholder or on the Board of Directors for NFC.  (Day 6, Vol. 1, pp. 42, 44, 48)
[34] Paul Tilton informally consulted with the Defendant about NFC in 1997 or 1998.  Tilton was approached by the Defendant regarding renting his bakery during off-peak hours.  He was never a shareholder or on the Board of Directors for NFC.  (Day 6, Vol. 1, pp. 51, 60)

experts, the Court finds that NFC had and owned but did not turn over the Missing Recipes, that is, recipes for the following products: Boston cream pie, non-dairy lemon pie, key lime pie, walnut torte cake, carrot cake, chocolate cake, muffins, pizza dough, and brownies. The Court finds that the Defendant's denials regarding the existence of the Missing Recipes are self-serving and incredible. This finding is further supported by the Defendant's recreation of recipes for Boston cream pie and pizza dough that he offered to the Plaintiff on January 11, 2006, Day Three of the trial, as well as the "discovery" of test recipes for brownies found in files stored in Attorney Oberhauser's garage the weekend before the trial began.

153.    In testimony, the Defendant said that the walnut torte cake recipe could be adapted for different cakes and muffins. He stated "cake recipes that you have can be used to make cupcakes or muffins. You just have to alter the recipe either by adding chocolates for chocolate chips or blueberries for blueberries or raspberry for raspberry or whatever the flavor might be." (Day 1, Vol. 2, p. 181) The Court also heard testimony from Bolster in regards to the "Bolster Documents." He said that his notes on the walnut torte cake recipe indicated swapping cocoa for the walnuts. (Day 1, Vol. 1, p. 84, D. Ex. 3) The Court finds that the walnut torte cake recipe can be adapted for cakes, including chocolate cake, carrot cake, and muffins.

154.    The Court heard testimony regarding NFC recipes for dairy lemon pie and non-dairy lemon pie. Given that the target audience of NFC included those who are lactose intolerant, the Court finds that the Defendant had a recipe, not necessarily commercially ready, for non-dairy lemon pie.

155.    The Defendant introduced two exhibits that he asks the Court to find are NFC recipes. The first is Defendant's Exhibit 3, which is a collection of documents that Bolster brought to a hearing before this Court on September 2, 2004 ("Bolster Documents"). The printed pages are

from the *Practical Baking* book by Sultan and the handwritten notes are Bolster's.  (Day 1, Vol. 1, p. 55, D. Ex. 3)

156.    The last time Bolster worked for NFC was in 1994.  (Day 1, Vol. 2, p. 182)  After he left, recipes for NFC products were materially revised.  (Day 1, Vol. 2, p. 184) Also after he left, the products were targeted to the lactose intolerant and diabetics and the recipes were changed to reflect the needs of these target consumers.  (Day 1, Vol. 1, pp. 63-64)

157.    The Bolster Documents contain many ingredients that Naturally ME does not use, and NFC did not use, including eggs, potato flour, corn, and sugar.  (Day 4, Vol. 2, p. 232)  For example, the key lime pie recipe used heavy cream; the pizza crust recipe calls for honey which cannot be eaten by diabetics.  On Bolster's handwritten notes, the Boston cream pie calls for potato flour, eggs, and honey.  (Day 1, Vol. 1, pp. 68-70; D. Ex. 3)  The lemon chiffon pie filling calls for egg yolks, butter, and egg whites as well as sugar.  The sponge cake calls for glucose and corn syrup, eggs, and cake flour.  Cake flour cannot be eaten by celiacs.  (Day 1, Vol. 1, pp. 68-70)

158.    Additionally, the handwritten notes do not contain mixing or baking instructions, and are therefore not recipes.  (Day 4, Vol. 2, pp. 230-231)  The Court finds that the Bolster Documents are not the Missing Recipes.

159.    The second exhibit is Defendant's Exhibit 22 which the Defendant obtained from Mailman, who belatedly found them in the bottom of a box ("Mailman Documents").  (Day 3, Vol. 1, pp. 32-33; D. Ex. 22)  He admitted that although the Mailman Documents have lists of ingredients, there are no mixing and baking instructions, and agreed that it is misnomer to call them recipes.  (Day 3, Vol. 1, p. 102)  He also testified that these lists dated from before 2002 because they include potato flour, which NFC removed from its products in 2002.  (Day 3, Vol. 1, p. 33)

160.    Bessermin testified that the Mailman Documents are not recipes, but cost analyses to determine how the product should be priced.  (Day 4, Vol. 2, pp. 232-233)  A recipe has to have a

list of ingredients, mixing instructions and baking instructions, and the Mailman Documents have only a list of ingredients. (Day 4, Vol. 2, p. 252) Bessermin also noted that the ingredient lists include items that Naturally ME does not use – dairy and corn. (Day 4, Vol. 2, p. 233) These are items that NFC did not use either. The Court finds that the Mailman Documents are not the Missing Recipes.

161.    Bessermin tried to make the Boston cream pie from the document in Defendant's Ex. 22, but it was a "disaster." (Day 4, Vol. 2, pp. 233-234, 253) The ingredients needed to be altered and there were no mixing instructions or cooking instructions. (Day 4, Vol. 2, p. 254)

162.    The Defendant testified that of the "recipes" he obtained from Bolster and Mailman, "a few of those look authentic." In other words, he claimed a few were authentic and a few were not. (Day 2, p. 73)

163.    In an effort to deliver all of NFC's recipes, the Defendant claims to have called the subcontractors that NFC used which were Bello Foods, Energy Foods, Mother Nature's Goodies, Tilton Baking Company, as well as one of the former employees who testified at trial. (Day 2, p. 71; Day 3, Vol. 1, p. 87) He also claims he called Mrs. Bessermin and Bessermin. (Day 2, p. 71; Day 6, Vol. 2, pp. 206-207) Bessermin denied that the Defendant ever contacted him to ask him to turnover any recipes. (Day 4, Vol. 2, p. 229)

164.    The Defendant also cites to the information in "Mr. Attridge's Response As Efforts to Retrieve Assets."[35] (Pl. Ex. 64)

165.    The Defendant testified that he asked Oberhauser for recipes; however, he did not ask Oberhauser for his files until January 2006, on the eve of this trial. (Day 5, Vol. 2, p. 138) He then looked through his files on January 10, 2006 and found some test recipes for brownies that he

---

[35] The Court notes that all of the efforts to find recipes described in that pleading were done by Oberhauser. He tried to get information from Bello Foods but did not get any cooperation. (Day 5, Vol. 2, pp. 133-134) Oberhauser called Mrs. Bessermin. (Day 5, Vol. 2, p. 134)

turned over.  (Day 3, Vol. 1, p. 89)  The folder was noticed by Nina Attridge during the evening of

January 10, 2006, and produced to the Plaintiff on the record in Court on January 11, 2006.  (Day 3,

Vol. 1, p. 89)

166.    The Defendant testified that he used the Bolster Documents and the Mailman

Documents to put together a recipe for a lemon pie on January 10, 2006, the night before his

testimony, and that he could have done that at any time once he had the "notes."[36]  (Day 3, Vol. 1,

pp. 99-101)

Damages

167.    The Plaintiff manufactures pies that are wheat and gluten-free, and free of trans-fats

and processed sugar.  Naturally ME presently manufactures apple, blueberry, apple-cranberry,

chocolate mousse, and pumpkin pies as well as pie shells.  (Day 3, Vol. 2, p. 140)  Its target market is

celiacs, diabetics, heart patients, those with other food allergies, vegans, and those who want to eat

healthy.  (Day 3, Vol. 2, pp. 142-143)

168.    The Plaintiff's products are sold in 150 stores, including the Big Y chain and it has

approval from Hannaford.  Its products are carried by five distributors.  (Day 3, Vol. 2, p. 144)  It

also sells its products through its website.  (Day 3, Vol. 2, p. 143)

169.    Kunzig, who has spent his professional career in the food business, testified that he

thought the NFC line of products was "superb" because it had an important place and the market

still has not been realized.  He noted that "the penchant for natural foods in this country is

escalating."  (Day 4, Vol. 2, p. 139)

170.    The Plaintiff received a bronze medal from "New Products Magazine" for best new

product in the country for 2005 for its pies.  (Day 5, Vol. 1, p. 42)

---

[36] The Court notes that the Defendant has had the Bolster Documents since September 2004 and the
Mailman Documents for a couple months prior to his testimony but did not put together what he claims is a
recipe for lemon cream pie until the night before his testimony.  (Day 3, Vol. 1, p. 101)

171.    In December 2005, the Plaintiff had five employees.  In January 2006, it laid off two

employees, including Mrs. Roberts, and was down to three.  Roberts attributed that to the cyclical

nature of the pie business.  Pie sales slump after Christmas and the Plaintiff needs to broaden its

product line to fill in those slow periods.  (Day 3, Vol. 2, p. 187; Day 4, Vol. 1, p. 76; Day 4, Vol. 2,

pp. 207-208)  The Defendant agreed that the pie business is cyclical with most sales occurring during

the fall holiday season.  A company that sells pies can expect to do most of its business during the

last quarter of the calendar year.  (Day 1, Vol. 1, p. 115)

172.    The top five products that the Plaintiff would like to make to expand its product line

are: Boston cream pie, lemon pie, carrot cake, muffins, and pizza dough (collectively, "Targeted

Missing Recipes").  This list is based on discussions with consumers about additional products that

the consumers would like to see the Plaintiff produce.  (Day 4, Vol. 2, p. 230)  The Plaintiff would

need to purchase additional equipment to manufacture these products:  mixers at a total cost of

$10,000; a depositor at a cost of $5,000; and new packaging at a cost of approximately $15,000.

(Day 4, Vol. 2, pp. 235-236, 258-259)  The Plaintiff would not roll out all five products at the same

time, but would do so over time and would eventually employ between 50 and 54 people.  (Day 4,

Vol. 2, p. 236)

173.    The Plaintiff asks the Court to determine that its damages from not receiving the

Targeted Missing Recipes are lost profits of $2.3 million.  The Defendant asks the Court to find that

the Targeted Missing Recipes had no value because they were never in production.  The Court will

address each position in turn.

Naturally ME's Damage Evidence

174.    Roberts has participated in several trade shows, where the Plaintiff's pies have been

well-received.  (Day 3, Vol. 2, p. 186)  He is often asked if the Plaintiff will produce bread products,

pizza, cakes, including chocolate cake, bars dinner rolls and other flavors of pies.  (Day 3, Vol. 2, pp.

186-187)

175.    Bob Burke, a consultant in the natural foods industry, testified as an expert witness

for the Plaintiff on sales and marketing of natural food products for the Plaintiff.  Burke worked for

Stonyfield Farm Yogurt for eleven years as vice president of sales and marketing and vice president

of sales in corporate development.  He has been a consultant for eight years, mainly in the natural

products, organic products, specialty and gourmet products areas.  He helps bring products to

market, and has written business plans and done budgeting and planning.  He has also worked on

building distribution and putting broker networks together.  (Day 5, Vol. 1, p. 39)

176.    Burke presents full day seminars on how to bring products to market in the natural

products industry for companies and at food expos.  (Day 5, Vol. 1, pp. 39-40)  He has also written

several books, including *The Natural Products Field Manual, Staking out Space in the Supermarket Shelf* and

*The Sales Manager's Handbook.*  (Day 5, Vol. 1, p. 39)

177.    Burke explained that the natural and organic food market is growing very fast.  An

important segment of that market is the gluten-free market which is also growing rapidly, because

there is increasing awareness that gluten may affect auto-immune diseases like multiple sclerosis and

rheumatoid arthritis, in addition to celiac disease.  He said there is a general growth and awareness of

allergens in general, and mainstream supermarkets are increasingly carrying these kinds of items in

the health food sections of their stores.  (Day 5, Vol. 1, pp. 44-45, 48, 54)

178.    Burke's report contains an overview of the growth in dollars of the natural food

industry in recent years.  The natural food industry grew by 12 percent in 2004, while the general

food industry was flat.  Burke's report also contains descriptions of all of the possible retail outlets

and the number of stores in each type of outlet.  (Day 5, Vol. 1, pp. 45-46; Pl. Ex. 46)

179.    In reviewing sales data, Burke found that the sales of gluten-free products are growing at a faster rate than the overall growth in the natural products market.[37] (Day 5, Vol. 1, p. 59) It has also been his experience that new entries in the natural and specialty food market tend to do very well and not fail at the rate of new entries in the regular food market. (Day 5, Vol. 1, pp. 100-101)

180.    Burke prepared a report on the potential sales for the Targeted Missing Recipes the Plaintiff proposes to manufacture and sell: Boston cream pie, lemon pie, carrot cake, muffins, and pizza dough. (Day 5, Vol. 1, p. 43) He analyzed the potential sales from two perspectives – top-down and bottom- up. (Day 5, Vol. 1, p. 42; Pl. Ex. 46)

181.    In preparing his report, Burke spoke with Roberts and Bessermin and discussed the five products the Plaintiff would be most likely to launch. (Day 5, Vol. 1, p. 61) He relied on prices for the products that would be charged to distributors that were provided to him by the Plaintiff. (Day 5, Vol. 1, p. 67) He also spoke with Wayne Davey ("Davey"), the Plaintiff's contract Vice President of Sales, who prepared a very detailed sales budget that extended out for 10 years. (Day 5, Vol. 1, pp. 61-62) Burke described Davey's report as an operating budget that the Plaintiff could use as a sales plan. (Day 5, Vol. 1, p. 92)

182.    Burke described the "bottom-up approach" as looking at the number of stores the Plaintiff would expect to sell to each year as well as the number of items they would expect each store to carry and a reasonable sell rate for those categories. He then looked at the pricing per product and multiplied that to get an estimate of dollar sales. (Day 5, Vol. 1, pp. 60)

183.    For the bottom-up approach, Burke looked at the stores that would be most likely to carry this type of product. He also considered geography, with the Plaintiff starting in the Northeast

---

[37] Burke only examined the market for gluten-free products. He did not look at the market for products for diabetics, vegans and those wanting to eat heart-healthy, for whom these products would also be attractive. (Day 5, Vol. 2, pp. 123-124)

and moving outwards.  He estimated that the number of stores would increase yearly, with a total of 850 stores carrying these products by the end of the tenth year, which he concluded was conservative given that there are 8,600 natural food stores and 32,000 supermarkets in the United States.  (Day 5, Vol. 1, pp. 69-72)

184.    Burke claimed he was conservative in looking at projected sales for only the five products.  He explained that particularly with the pizza crust and the muffins, it is likely that the Plaintiff would be able to introduce a variety of flavors.  (Day 5, Vol. 1, pp. 76-77)  He claims that he was also conservative in estimating "turns," which he described as the rate in which the product sells in the store.  He estimated one turn per product per store per week.  In other words, he estimated that the Plaintiff would sell only one of each of the five products in each store each week.  (Day 5, Vol. 1, pp. 77-78)

185.    Using the bottom-up approach, Burke estimated the Plaintiff's total sales for the five products to be $50,539,484 over the next 10 years.  (Day 5, Vol. 1, pp. 64-65, 79; Pl. Ex. 46)

186.    The second method is called the top-down approach, which looks at the total sales of each category of product and the market share that the new product would reasonably be expected to achieve.  (Day 5, Vol. 1, pp. 60-61)

187.    For the top-down approach, Burke looked at the size of the category and the other competitors and used his judgment to determine a reasonable market share.  (Day 5, Vol. 1, pp. 81-82)  As detailed in his report, he believes the size of the Plaintiff's market share will grow over time as it engages in more name-building activities, such as trade promotions, advertising and the like.  (Day 5, Vol. 1, pp. 84-85)

188.    Burke noted that gluten-free consumers tend to be more educated about products, as they do research on the web and have support groups.  (Day 5, Vol. 1, p. 85)

189.    Using the top-down approach, Burke estimated the Plaintiff's total sales for the five products to be $50,971,206 over the next 10 years. (Day 5, Vol. 1, p. 64-65; Pl. Ex. 46)

190.    Mark Filler ("Filler"), a Certified Public Accountant, testified as an expert on lost profits for the Plaintiff. (Day 5, Vol. 2, p. 169; Pl. Ex. 69)  In addition to his CPA designation, he is certified by the National Association of Certified Valuation Analysts as a valuation analyst and by the Institute of Business Appraisers as a business appraiser.  He is also accredited in business valuation by the American Institute of CPAs and an accredited member of the American Society of Appraisers.  He has also published articles on lost profits and lectured on the topic. (Day 5, Vol. 2, pp. 166-167)

191.    Filler was engaged by the Plaintiff to measure the profits the Plaintiff will lose from not having the same five (5) Targeted Missing Recipes that Burke used in his analysis. (Day 5, Vol. 2, pp. 169-170)  In preparation for his analysis, Filler spoke with Betro, Roberts, Bessermin, Burke and Davey, made a site visit to the plant and purchased and ate a blueberry pie.  He reviewed the Plaintiff's financial statements, marketing materials and the website. (Day 5, Vol. 2, pp. 170-171)  He felt it was very important to make sure that the Plaintiff is an actual company with a management team, budgets and projections, and that is currently selling products. (Day 5, Vol. 2, pp. 186-187)

192.    As explained in greater detail in Filler's testimony and his report, he used Davey's sales information together with projected expenses for overhead including ingredients, employees and administration, as well as current expenses, to form his opinion. (Day 5, Vol. 2, pp. 173-182; Pl. Ex. 47)

193.    Filler capped the Plaintiff's sales at $29 million, which was the number provided to him by Davey, rather than the $50 million estimated by Burke for the five products, because that is the company's present capacity if it remains in the same physical space running three production

shifts.  Therefore Filler's lost profit number is more conservative than it would have been had

Burke's sales projections been used.  (Day 5, Vol. 2, p. 179)  In other words, the lost profits from

not having the five Targeted Missing Recipes would potentially be even greater if the Plaintiff had

greater production capacity.  (Day 5, Vol. 2, p. 226)

194.    Filler testified that the sales projections for the five additional products were not in a

straight line, but were in a sigmoidal curve, which is consistent with how sales of new products

operate.  With a new product, according to Filler, sales start slowly, then speed up dramatically, then

slow down and taper off.  (Day 5, Vol. 2, p. 181; Pl. Ex. 47, Ex. H)  The sales projections also took

into account that sales of the additional five products will be much less cyclical than the sales of pies.

(Day 5, Vol. 2, p. 224-225)

195.    Filler discounted the potential lost profits by 40 percent.  He took into account

various factors in arriving at that discount rate, including that the Plaintiff has little operating history

and is introducing new products.  (Day 5, Vol. 2, pp. 182-184; Pl. Ex. 47, Ex. A)  He characterized

the 40 percent discount rate as "very aggressive" a "venture capital rate."  (Day 5, Vol. 2, pp. 183-

184)

196.    Based on all of the information discussed above and in his report, and applying the

40 percent discount rate, Filler concluded that the Plaintiff's lost profits from not having recipes for

Boston cream pie, lemon pie, carrot cake, muffins, and pizza dough are $2.3 million.  (Day 5, Vol. 2,

p. 186; Pl. Ex. 47)

The Defendant's Damage Evidence

197.    The Defendant presented testimony from Reilly, whom the Court accepted as

qualified as an expert on consumer product development.[38]

---

[38]  The Court accepted Reilly as a marginally qualified expert over the objections of the Plaintiff.  The Plaintiff
asked the Reilly not be allowed to testify pursuant to Fed.R.Civ.P. 26, as applicable to this proceeding by
Fed.R.Bank.P. 7026, because the Defendant had not tendered a written report.  The Plaintiff also objected to

198.    Reilly holds a B.S. in marketing and an MBA in management, both from the California State University at Long Beach.  He began his employment in the food industry in 1971, when he went to work for Hunt-Wesson Foods ("Hunt-Wesson").  He was employed by Hunt-Wesson until June of 1999, when he began a consulting practice, Inventory Capital Consultancy. (Day 6, Vol. 1, pp. 93-94, 110)  He has worked primarily with businesses other than food companies since starting his consulting practice.  (Day 6, Vol. 1, p. 97)

199.    While at Hunt-Wesson, Reilly's primary emphasis was on new product development. He was responsible for approximately 100 new products making it to market.  (Day 6, Vol. 1, pp. 96-97)  He also worked on food products in other areas of the market.  (Day 6, Vol. 1, p. 98)

200.    Reilly described how a new food product is brought to market, in a large corporation, which he called a "new food development process."  (Day 6, Vol. 2, p. 158; D. Ex. 23) He said that a product rarely starts with a recipe; it usually starts with an idea.  (Day 6, Vol. 1, p. 116) The next step in the process is a market assessment, which examines the size of the potential market.  (Day 6, Vol. 1, pp. 117-118)

201.    Reilly testified that the next step in his analysis is a risk analysis, when the company looks at possible competitors, as well as whether the product is easily duplicated.  He said if the market assessment and risk assessment show that it is worth going forward with a product, the next step is recipe development.  After the recipe is developed, Reilly said the company would reassess its risk with the additional information it had gathered.  (Day 6, Vol. 1, pp. 118-124)

202.    If the company still decides to go forward, the next step according to Reilly, is to develop a formula which requires converting the ingredients to those that can be used in a commercial production facility.  At the end of the process, the formula would be ready to be tested.

---

Reilly's qualification as an expert.  The Court overruled both objections, however, the Court noted that Reilly's qualifications were only "marginal."  (Day 6, Vol. 1, pp. 113-114)

(Day 6, Vol. 1, pp. 124-126)  Reilly testified that the packaging for the product and for shipping the product would be designed at this point in the process, together with a shelf life study.  He said he would also look at production requirements, such as the type of equipment needed to produce the product, to determine how much capital would be needed.  (Day 6, Vol. 1, pp. 127-128)

203.    The next step, which Reilly called "financial assessment, commercialized formula," examined the capital investment in equipment and inventory.  He would examine the marketplace to see if any competitors had done anything that would impact the marketplace while his company was working on the product.  (Day 6, Vol. 1, pp. 128-129)

204.    Reilly said the next step was to take the product to a commercial facility to actually produce it.  The product would be run through a variety of tests in order to obtain regulatory approval.  He said that the FDA will not approve the product until the plant work is done.  (Day 6, Vol. 1, pp. 129-130) Reilly said the final step is to do a break-even analysis and look at downside risk on volume, sales, price and ingredient costs.  (Day 6, Vol. 1, p. 140-141)

205.    Reilly concluded that unless a product is selling in the marketplace, it has no value.  (Day 6, Vol. 1, pp. 146-147)  If NFC had sold any of the products at issue, it would have made a big difference in his conclusion.  (Day 6, Vol. 2, pp. 167)

206.    Reilly had no familiarity with the products sold by the Plaintiff, other than what he had read in the Burke and Filler reports in preparation for his testimony.  (Day 6, Vol. 2, pp. 155-156)  He did not meet with any of the Plaintiff's principals nor did he discuss the recipes with them.  (Day 6, Vol. 2, p. 186)  He also had no knowledge of distributors of specialty foods.  (Day 6, Vol. 2, p. 164)

207.    Reilly testified that he would assume from the brownie information on the sell sheet admitted as Plaintiff's Exhibit 10 that it was a viable brownie shelf stable product because it had the weight and the UPC code.  Reilly said a UPC code suggests the product is in the last stage of

50

development.  (Day 6, Vol. 2, p. 175)  The fact that there was no nutritional information on the sell sheet did not change his opinion, because if a product is on a sell sheet, "it suggests there is something to sell."  (Day 6, Vol. 2, pp. 143-144, 168, 172)

208.    Reilly testified that NFC's label for non-dairy lemon pie, Plaintiff's Exhibit 71, indicated to him that it was a product ready to sell.  The label contained the nutritional information showing that it had FDA approval and therefore had gone through the development process he described.  (Day 6, Vol. 2, p. 170; Pl. Ex. 71)  Plaintiff's Exhibit 14, which included non-dairy lemon pie, also indicates to him that the product is ready to sell.  (Day 6, Vol. 2, p. 173-174)

209.    In the Defendant's opinion, the Targeted Missing Recipes are worthless because the products were never commercially manufactured or marketed.  (Day 3, Vol. 1, pp. 96-97)  His opinion is that there is no value until a product has been proven commercially, so there are repeat sales.  (Day 3, Vol. 1, p. 97)  His opinion is interesting, given that that on one occasion the Defendant was verbally offered $5 million for NFC's assets, including the recipes.  (Day 1, Vol. 1, pp. 52-53)

210.    Reilly's testimony was not helpful to the Court because he has no familiarity with small businesses, no familiarity with the types of products at issue, and no familiarity with valuation of recipes.

<u>Discussion for Adversary Proceeding 04-1249</u>

<u>Count One: Conversion</u>[39]

The Plaintiff is seeking a judgment against the Defendant for conversion of the assets purchased by the Plaintiff, including the Missing Recipes, Laptop, and other miscellaneous assets.[40] "The elements of conversion require that a defendant be proved to have 'intentionally or wrongfully

[39] Counts Two and Four of the Complaint have been withdrawn.
[40] The Court heard limited testimony on the Laptop and the other miscellaneous assets alleged to be missing. The Plaintiff did not proffer any testimony or evidence regarding the estimated values or damages for anything other than the Target Missing Recipes.

exercise[d] acts of ownership, control or dominion over personal property to which he has no right

of possession at the time . . ." *Bleichen v. Stark*, 813 N.E.2d 572, 576, 61 Mass.App.Ct. 619, 622

(2004) quoting *Abington Nat'l Bank v. Ashwood Homes, Inc.*, 475 N.E.2d 1230, 19 Mass.App.Ct. 503

(1985). "An action for conversion 'cannot be maintained without proof that the defendant either

did some positive wrongful act with the intention to appropriate the property to himself or to

deprive the rightful owner of it, or destroyed the property." *Kelly v. LaForce*, 288 F.3d 1, 12 (1st Cir.

2002). Conversion must be proven by a preponderance of the evidence. This evidence, however,

may be circumstantial. "'The rule as to circumstantial evidence in a civil case is that a party will

prevail if the preponderance of the evidence is in his favor.'" *Burgess v. Small*, 151 Me. 271, 273, 117

A.2d 344, 345 (Me. 1955) (*quoting Exchange State Bank of Glendive v. Occident Elevator Co.*, 95 Mont. 78,

24 P.2d 126, 129 (Mont. 1933). " The solution of any issue in a civil case may rest entirely upon

circumstantial evidence." *Id.* A defendant may not use the defense that he acted in good faith.[41]

Prior to determining whether the Defendant had possession of the Missing Recipes, the

Plaintiff has the burden of showing that the Missing Recipes existed. The Court finds that the

following recipes existed: Boston cream pie, non-dairy lemon pie, key lime pie, walnut torte cake,[42]

chocolate cake, carrot cake, muffins, pizza dough and pizza shells, and brownies. The Court is not

finding that the Missing Recipes were necessarily ready to be commercially produced; instead it is

finding that NFC had begun developing these Missing Recipes and they were at different stages of

development.

The Court finds that NFC had a recipe for Boston cream pie for the following reasons.

First, NFC produced Boston cream pies for functions at Boston's Children's Hospital. Second, in a

---

[41] That is not the situation in the instant case. The Defendant claimed that he did not have the Missing Recipes and Laptop in his possession; he has not claimed that he mistakenly believed he had legal right to possession of the goods.

[42] As stated earlier in Par. 153 of the Findings of Fact the Court finds that the walnut torte cake recipe can be adapted for cakes, including chocolate cake, carrot cake, and muffins.

memo from the Defendant to the Board dated July 7, 2000, he described his trip to Mother Nature's

Goodies, "I have set up and trained Mother Nature's Goodies production team to manufacture and

package fruit pies and pie shells.  My next visit will be to continue training for Chocolate Mousse,

Key Lime and Boston Cream pies."  (Pl. Ex. 17)  Third, Boston cream pies were included on two

different price sheets that were provided to wholesalers dated October 1, 1998 and April 10, 2002.

(Pl. Ex. 20, 23)  Fourth, in an agenda for the Board of Directors meeting on July 13, 1999, the

Defendant listed for discussion NFC's intent to begin manufacturing Boston cream pies at the

Brockton facility one to two days a week.  (Pl. Ex. 15)  Fifth, in notes from a Board meeting held on

April 8, 2000, Perry Boudreau urged the immediate production of Boston cream pies.  (Pl. Ex. 16)

And finally, the Court heard testimony from Bessermin that the Defendant intimated in

conversations that the Phranil plant could have production of Boston cream pies up and running

within two weeks.  (Day 4, Vol. 2, p. 225)  Finally, the Defendant faxed a letter addressed to Dyer to

Roberts in October 2002 discussing products NFC would like to sell at Starbucks.  (Pl. Ex. 60)  The

Defendant included Boston cream pie as one of the products NFC would like to offer Starbucks.

Roberts said that the Defendant "assured" him that he had recipes for all of the products listed.

(Day 4, Vol. 1, p. 34)  Clearly, NFC had a recipe for Boston cream pie.

        The Court finds that the Defendant has a recipe, not necessarily one that is commercially

ready, for non-dairy lemon pie.  First, there was a label for the pie that listed ingredients, net weight,

nutritional facts, and a UPC code.  (Pl. Ex. 71)  Second, non-dairy lemon pie is listed on an order

form from August 1998.  The listing includes the weight and price of the non-dairy lemon pie.  (Pl.

Ex. 72)  Third, non-dairy lemon pie was listed on a production report from November 7, 1998.  (Pl.

Ex. 12)  Additionally, non-dairy lemon pies were included on a price list distributed at a tradeshow in

Anaheim, CA attended by Kunzig and Roberts on behalf of NFC.  (Pl. Ex. 20, p. 36; Pl. Ex. 48, Tab

11, p. 26; Day 4, Vol. 2, pp. 136-37)  Finally, the Defendant testified that he used the Bolster

Documents and the Mailman Documents to put together a recipe, minus the sweetener, for a non-dairy lemon pie on January 10, 2006, the night before his testimony, and that he could have done that at any time once he had the "notes."[43]  (Day 3, Vol. 1, pp. 99-101)  The Court finds that a recipe for non-dairy lemon pie existed.

The Court finds that NFC had a recipe for key lime pie for several reasons.  First, in the memo discussed above regarding Mother Nature's Goodies, the Defendant stated that on his next trip to California, he was going to train the production team on how to produce key lime pies.  (Pl. Ex. 17)  Second, key lime pie was included on a price sheet distributed to wholesalers in April 2002. (Pl. Ex. 23)  Third, in conversations with Bessermin, the Defendant suggested that production for key lime pie at Phranilcould begin in the near future because it was based upon the chocolate mousse recipe.  (Day 4, Vol. 2, p. 225)  Additionally, both Roberts and Mrs. Roberts testified that they saw a recipe for key lime pie recipe in a manila folder in NFC's office in their home.  (Day 3, Vol. 2, p. 163-164; Day 4, Vol. 2, p. 198)  Finally, in March 2003, while the Defendant was trying to sell the assets of NFC, he included key lime pie on the "Product and Sales Mix" sheet that he was circulating to potential buyers.  (Pl. Ex. 31)  Therefore, the Court finds that a recipe for key lime pie existed.

The Court finds that a recipe for walnut torte cake also existed for several reasons.  First, the Defendant made walnut tort cake for events at the Boston Children's Hospital.  Second, NFC submitted an insurance claim on September 30, 1996 for walnut tort cakes lost due to the breakdown of a freezer.  (Pl. Ex. 8)  Walnut torte cake was also included on an order form distributed to potential buyers as a new product of NFC.  (Pl. Ex. 72)  The Defendant's expert said it could be inferred from this form that NFC had a recipe for walnut torte cake because the

---

[43] The Court notes that the Defendant had the Bolster Documents since September 2004 and the Mailman Documents for a couple months prior to his testimony.  (Day 3, Vol. 1, p. 101)

description included a list of ingredients.  (Day 6, Vol. 2, p. 181)  Additionally, Mr. and Mrs. Roberts

both testified that they saw a manila folder in the NFC office in their home that contained a recipe

for a walnut tort cake and a chocolate cake.  (Day 3, Vol. 2, p. 164; Day 4, Vol. 2, p. 199)  Finally, in

spring of 2003, the Defendant prepared a business proposal in order to sell NFC's assets.   In an

email on April 6, 2003 from Kunzig that was a draft letter from the Defendant to Jack Brace, a

potential purchaser of NFC's assets, the Defendant stated "We have developed several budgets for

planning purposes with the immediate focus centered on Pies and Cakes, as they are the most

profitable."  (Pl. Ex. 33)  When all of the information is taken together, the Court easily infers that

there was a walnut torte cake recipe.  The Court finds that a walnut torte cake recipe did exist.

The Court finds that recipes for chocolate cake, carrot cake, and muffins existed as well.

Based upon the evidence regarding the existence of a walnut torte cake recipe and the Defendant's

own testimony in which he said that the walnut torte cake recipe could be adapted for different

cakes and muffins, "cake recipes that you have can be used to make cupcakes or muffins.  You just

have to alter the recipe either by adding chocolates for chocolate chips or blueberries for blueberries

or raspberry for raspberry or whatever the flavor might be."  (Day 1, Vol. 2, p. 181)  Additionally,

the Defendant faxed a letter addressed to Dyer to Roberts in October 2002 discussing products

NFC would like to sell at Starbucks.  (Pl. Ex. 60)  Cake muffins, "3 flavors," and chocolate cake

were included on the proposed products list.  Roberts said that the Defendant "assured" him that he

had recipes for all of the products listed.  (Day 4, Vol. 1, p. 34)  Mrs. Roberts saw a recipe in a

manila folder for chocolate cake.  She said the recipe contained measurements, blending

instructions, and cooking instructions.  (Day 4, Vol. 2, pp. 198-199)  The Defendant made Roberts

and Mrs. Roberts a gluten-free chocolate cake with an NFC recipe.  (Day 1, Vol. 2, p. 185; Day 3,

Vol. 2, p. 170; Day 4, Vol. 2, pp. 199, 214)  The Defendant said that the chocolate cake was a

version of the walnut torte cake.  (Day 2, p. 49)  Finally, chocolate cake was included on a "Natural

Feast Corporation Sample Request Form." (Pl. Ex. 61)   The Court finds that recipes for chocolate cake, carrot cake, and muffins existed.

The Court finds that a recipe for pizza dough also existed for several reasons. First, the Defendant had made pizza using a recipe in the Roberts' home. (Day 4, Vol. 2, p. 199) Second, Mr. and Mrs. Roberts recalled seeing a recipe for pizza dough in the now missing manila folder. (Day 3, Vol. 2, p. 164; Day 4, Vol. 2, p. 199) According to Mrs. Roberts, the recipe contained measurements, blending instructions, and cooking instructions. (Day 4, Vol. 2, pp.198-199) Finally, the Defendant produced a recipe after receiving the Mailman Documents and the Bolster Documents. The recipe was given to the Plaintiff during the trial. The Court finds that there was a recipe for pizza dough which could also be used for pizza shells.

Finally, the Court finds that a recipe for brownies existed for several reasons. First, chocolate brownies were listed on a product sheet distributed to wholesalers at a tradeshow in Anaheim, CA attended by Kunzig and Roberts. (Pl. Exh. 10) The product sheet included the size, weight, unit and a UPC code for the brownies.[44] There was also evidence that NFC had begun developing a label for brownies. (Pl. Exh.10) Second, there was an order form distributed to buyers in 1998 that listed chocolate brownies as a new product. (Pl. Ex. 72) The Defendant's expert said it could be inferred from this form that NFC had a recipe for chocolate brownies because the description included a list of ingredients. (Day 6, Vol. 2, p. 181) Finally, during the trial, the Defendant produced test recipes for brownies that had been found in Attorney Oberhauser's garage.[45] The Court reasonably infers that NFC may not have had a recipe ready for immediate commercial production; however, it definitely had a recipe for brownies that was well on its way to commercial readiness.

---

[44] Even the Defendant's expert said "[i]t (the sell sheet) says that I've got a chocolate brownie shelf stable, it tells me what size it is, it says that it's got a weight, it's got units, it's got all the information I need, it's got a UPC code, it would suggest that this is a viable product."
[45] Attorney Oberhauser had some boxes containing documents from NFC.

Additionally, the Court's findings are bolstered by the actions of the Defendant, most significantly when the Chapter 11 Trustee filed a motion to sell the assets of NFC to the Plaintiff, Naturally ME. The Defendant filed an objection to the sale claiming that the Trustee was not "describing the assets and intellectual property owned by the debtor (NFC) correctly in his papers." (Pl. Ex. 57) He claimed that the stipulated agreement entered into in July 2003 limited the term "Recipes" to the pie recipes and it did not include generally all know how, trade secrets and other proprietary information nor did it include formulas related to certain unspecified wheat free gluten free non-hydrogenated oil products. (Pl. Ex. 57) The stipulation entered into in July 2003 defined "Recipes" as the recipes, formulas and proprietary manufacturing processes used by the debtor at any time pre-petition or post-petition. It was not limited to the pie recipes as alleged by the Defendant. Judge Kenner overruled the Defendant's objection and allowed the motion to sell.[46] The Court finds that his objection and objective of limiting the sale of the recipes to only the commercially produced pie recipes suggests that there were other recipes and formulas in different stages of development. And it makes the Court ask, if these other recipes did not exist as the Defendant argued in the instant case, why did the Defendant object to the language of the Trustee's motion to sell?

In the instant case, based upon the evidence and testimony proffered, the Court finds that the Defendant had possession of the Missing Recipes.

After the initial filing of the involuntary bankruptcy, the Chapter 11 Trustee, Jonathan Yellin, conducted the 341 Meeting of the debtor, NFC, on May 23, 2003. (Pl. Ex. 54) The Defendant served as the representative of the debtor because of his position as president of the company. At

---

[46] It was never explained to the Court in the instant case what happened to the non-commercial recipes that he was trying to protect. Additionally, the Defendant never turned over any of the recipes or formulas to the Plaintiff, and purchaser of NFC's assets, even the ones currently being used. After the involuntary bankruptcy, Roberts turned over all of the books and records that he had in his home while it served as the corporate office for NFC. Roberts retained a copy of those recipes in production at Phranil: the fruit pies, pie shells, streusel tortes, and chocolate mousse pie. (Day 3, Vol. 2, pp. 190-191)

the 341 meeting, the Defendant asserted that he and his wife, Nina Attridge as partners, owned the

recipes used by NFC. He further stated that he had entered into negotiations with Trumark

Industries to purchase the baking equipment and inventory that was still located in the Phranil

Foods building.[47]  In response to questions regarding what Mr. Brace was purchasing, the Defendant

said, "[H]e (Brace) made a request from me to license the recipes." (Pl. Ex. 54, p. 10 -11)  Ms.

Harbeson, attorney for NFC added, "It's been the debtor's position that Mr. Attridge owns the

recipes individually. So there was a condition of the sale that Mr. Attridge and Nina Attridge enter

into a licensing agreement with Trumark Industries." *Id.*  From the early stages of this bankruptcy,

the Defendant has claimed ownership of the Missing Recipes.

This is further supported by the testimony of Mr. and Mrs. Roberts regarding the

whereabouts of a folder containing recipes that had been stored in the debtor's office in their home.

Both said that there were two folders containing recipes in their home: a blue folder containing the

recipes of the pies that had been in production and a manila folder[48] containing the recipes of items

that had not been produced commercially. The Roberts contend that the manila folder containing

the additional recipes was removed from their home at some point in the fall of 2002. The only

individuals that had access to the folders in the office were Mr. and Mrs. Roberts and the

Defendant.

The Court does not find the assertion of the Defendant that he placed all of the recipes in

the Allston trailer, nor that the Defendant and Roberts destroyed all other copies of the recipes

except those contained in the blue folder and those on the Laptop as credible. First, the Court

heard the testimony of Trustee Yellin who said that when he went to the trailer, it was a chaotic

mess; papers were strewn everywhere and that he removed those documents that he deemed

---

[47] Phranil Foods had gone out of business. Trumark Industries, owned by Jack Brace, owned the building
and was negotiating with the Defendant to by the assets of NFC.
[48] In testimony, Mr. and Mrs. Roberts said they saw recipes other than the products currently in production,
including recipes for pizza dough, key lime pie, and chocolate cake.

valuable. None of these documents contained recipes. The Court finds the testimony of Trustee Yellin to be credible, and does not accept the Defendant's explanation that the trailer contained valuable documents such as test recipes. The Court is also not persuaded that the Defendant destroyed all copies of the recipes except those contained in the blue folder or on the Laptop. It belies common sense and strains credulity that the Defendant would destroy the only copies of recipes or place the only recipes in a trailer in Allston in one breath and claims that he, individually, owns the recipes in the next.

Finally, on November 13, 2003, the Defendant (pro se) filed an objection to the Chapter 11 trustee's motion for authority to sell assets free and clear of all liens, claims and encumbrances. (Pl. Ex. 57) In his opposition, the Defendant claimed that the trustee's definition for recipes was overly broad and should have only included those recipes for the fruit pies in production prior to the involuntary bankruptcy. *Id.* Even at this late point in time, the Defendant was trying to protect the recipes that had not gone into production yet. Taking all of these facts together, the Court concludes that the Defendant retained possession of the Missing Recipes.

Regarding the Laptop, again the Court concludes from the relevant testimony and evidence that the Defendant had possession (and perhaps still maintains possession) of the Laptop. The Court heard testimony from Roberts, Mrs. Roberts, Bessermin, and even the Defendant that he always had the Laptop with him. Roberts purchased the Laptop for NFC shortly after investing in the company. The Defendant acknowledged that he always traveled with the Laptop prior to the involuntary bankruptcy. He would, however, like the Court to believe that while he would not leave the Laptop overnight in the NFC office located in the Roberts' home, he did leave the Laptop in a manufacturing facility that was no longer producing NFC products, and in fact it was no longer producing any products. The Court finds that claim unbelievable.

Moreover the testimony of Bessermin that he saw the Defendant with a laptop in the fall of 2003 as well as evidence that the Defendant used an Apple Service Plan[49] purchased for the Laptop for service on a laptop makes it impossible for the Court to believe that the Defendant did not have possession of the Laptop at that time.  The Defendant further claimed that the laptop that Bessermin saw him with was borrowed from a friend, Elliott Hoffman; and the call to Apple Services was possibly for the same Hoffman laptop or another computer in his home.  The Court does not find the Defendant's testimony regarding the calls to Apple Service or the Hoffman Laptop to be at all credible.  The Court finds that the Defendant did have possession of the Laptop.

The Court must directly address the defense that the Defendant's statements regarding the 200 – 300 recipes were mere puffery.  The Defendant argues that his statements to the Roberts were merely the "genuine optimism of the committed entrepreneur."  (D. Proposed Findings of Fact and Conclusions of Law, p. 23).  This theory was supported by the testimony of Charles Mailman who said that the Defendant "was a very good talker" and that the investors often had to make him focus on the pies in production.  (Day 4, Vol. 2, p. 166)  The Court finds this argument lacks common sense and runs counter to the direct testimony of the Defendant's expert as well as other witnesses.  The Defendant's statements regarding the Missing Recipes were not limited to conversations with the Roberts.  Through memoranda and meetings, he apprised potential NFC investors and its Board of new products that would be available in the near future.[50]  These products included brownies, Boston cream pie, key lime pie and lemon pie.

---

[49] The Apple Care Protection Plan was purchased on 2/3/03 by the Defendant for the Laptop.  The Protection Plan stated that it covered the Laptop.

[50] The memos to the NFC Board of Directors and notes from the meetings demonstrate that as early as July 1999 the Defendant alleged that he had some of the Missing Recipes ready for production: (1) "Start manufacturing (1 to 2 days a week) – Boston Cream Pie" (Pl. Ex. 15); (2) Perry Boudreau (a board member) urged the immediate production of Boston Cream Pies (Pl. Ex. 16); (3) Memo from the Defendant to the Board, describing his recent trip to Mother Nature's Goodies, "My next visit will be to continue training for Chocolate Mousse, Key Lime and Boston Cream Pies" (Pl. Ex. 17).

Additionally, product sell sheets[51] had been created, under the Defendant's direction, which included some of the Missing Recipes. While the Defendant claims he did not create the product sell sheets[52], the product sell sheets were made available to prospective wholesalers, again with his approval. The Court does not accept the Defendant's statement that this was common practice in the industry. Both Kunzig[53] and Reilly, the Defendant's own expert, said that it was *not* the industry practice to include items that could not be produced. Kunzig testified that while he consulted for NFC, the Defendant was his only contact telling him what items could be produced or were available. In response to the question, " Would you have listed a product on the price list that Natural Feast Corporation could not provide?" He responded:

> No. Because it's the open-mouth, insert-foot syndrome. It's a very fast - - the quickest way to get yourself in terrible amount of trouble. If you - - if - - if you announce to the trade that you're going to do this, then you have to be very, very confident and positive that the supplier has the capabilities of doing that. Because as you go forward and suddenly the company cannot produce those items, then you're - - the delisting - - the deleting of your products comes a lot faster that the security of the products. (Day 4, Vol. 2, p. 132-133)

In an exchange between the Court and Reilly, the Defendant's expert, he agreed that if a product was on a sell sheet[54], it would be interpreted as being available for purchase:

> THE COURT: So if you saw this [sell sheet], you would assume that they were in the final stages, maybe waiting for FDA ingredient approval or something like that?

---

[51] Examples of the price sheets: (1) Price List from 10/01/98 which included chocolate brownies, Boston cream pie and lemon pie (dairy) (Pl. Ex. 20); (2) Price List from 4/10/02 which included Boston cream pie and key lime pie (Pl. Ex. 23).

[52] The Defendant claimed that the marketing vice president, David Krum, suggested listing the products unavailable for order on the sell sheets. The Defendant also said that Mr. Krum instructed him to say when responding to requests for products not in production that they are out of stock. (Day 6, Vol. 2, pp. 203, 224)

[53] Kunzig, the Plaintiff's witness, testified that his professional expertise was in sales development and marketing services and consumer package products, specifically food products, including frozen, dairy, or dry grocery. He was not proffered as an expert witness. He testified as a fact witness. He ran sales and marketing for Natural Foods Corporation beginning in late summer, early fall of 2001. His company helps companies like NFC get into market.

[54] The witness had been directed to examine Pl. Ex. 10.

> MR. REILLY:  It says that I've got a chocolate brownie shelf stable, it tells me
> what size it is, it says that it's got a weight, it's got units, it's got all the
> information I need, it's got a UPC code, it would suggest that this is a viable
> product.  (Day 6, Vol. 1., p. 144).

The Court finds the Defendant's argument regarding the product sell sheets to be unreliable in light of the testimony of Kunzig and Reilly.  Additionally, the Defendant has years of experience in the food industry as a consultant on projects involving marketing and public relations for Perrier USA, Shot & Steam stores, and Waupin (the corporation that owns BJ's Wholesale Club).  (Day 1, Vol. 1, p. 90-91)  In light of his experiences, the Court finds his testimony to be unreliable and self-serving.

Additionally, the Defendant had conversations with Bessermin at Phranil Foods regarding the imminent production of Boston cream pies.  Bessermin believed that production of the Boston cream pie could be up and running within a two-week time span.  He assumed that the Defendant had a recipe for Boston cream pie ready for production.  (Day 4, Vol. 2, p. 225)  Therefore, the Court is not persuaded by the Defendant's argument that all the talk about having 200 – 300 recipes was mere "puffery."[55]

Having found that the Defendant possessed the Missing Recipes and the Laptop and that the Defendant's argument of "puffery" is not persuasive, the discussion turns to whether the

---

[55]  The Court heard from several witnesses about the lack of credibility of the Defendant.  First, NFC's attorney, Pamela Harbeson, withdrew from representation because she did not believe the Defendant was being honest and truthful with her regarding the information he was providing in connection with NFC as well as Harbeson believed that the testimony that the Defendant gave before Judge Kenner in regards to the appointment of the Chapter 11 Trustee was not honest.  (Day 2, pp. 32-33)  Kunzig testified that Attridge had done some consulting for his company U.S. Specialty Products and RFK Enterprises.  Kunzig ended his relationship with the Defendant because the Defendant failed to contact a client of RFK Enterprises and it caused Kunzig "horrendous embarrassment."  (Day 4, Vol. 2, p. 153)  Attorney Greg Oberhauser said that the Defendant would not always follow through on the things that he asked the Defendant to do.  (Day 5, Vol. 2, p. 158)  Also, in a hearing for contempt held on September 2, 2004, the Defendant claimed that his attorney was not keeping him adequately informed claiming that he has not been notified approximately ninety (90) percent of the time.  Oberhauser stated he made "a lot" of effort to keep the Defendant informed about the proceedings.  Finally, the Defendant's own brother does not believe he can trust him because the Defendant removed papers out of their mother's home in Dover, MA that pertain to an ongoing matter in the Massachusetts Probate Court.  (Day 6, Vol. 1, p. 22)  Listening to the testimony of the two attorneys in good standing, the Defendant's own brother, and a former business associate, the Court concludes that the Defendant is not credible and that much of his testimony his self-serving and must be viewed in that light.

Defendant is liable for conversion.  "An action for conversion 'cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property.'"  *Kelly* at 288 F.3d 1, 12.  The Court finds that the Defendant is liable for conversion.  First, the instant case is not the first attempt by the Plaintiff to retain the Missing Recipes or the Laptop.  Since the court-approved sale in November 2003, the Court has held hearings and signed orders requiring the Defendant to turnover the Missing Recipes and the Laptop to no avail.  The Defendant has been cited for contempt and still has not produced the Missing Recipes or the Laptop.  In the instant case, the rightful owner, the Plaintiff, has been deprived of its property.

The Defendant argues that he has tried to comply with the Court's order to turnover and recover all recipes.[56]  But for all of the reasons provided above, the Court is not persuaded.  Additionally, during the trial, the Defendant provided two (2) recipes that he recreated using the Bolster and Mailman Documents.[57]  The Court is perplexed why the Defendant did not provide these recreated recipes to the Plaintiff sooner as the Defendant had access to both of these exhibits approximately two (2) months before the trial began.  Also, the Defendant was under a Court order to provide these recipes to the Plaintiff as soon as he had them, not to wait until the trial began.  Therefore, the Court finds the Defendant liable for conversion of the Missing Recipes and the Laptop.

<u>Count Three: Injunctive Relief and Turnover of Recipes</u>

---

[56] The Defendant alleged that he contacted Brian Bolster, Greg Oberhauser, Greg Bessermin, Charles Mailman, and Martin Adonean to recover any recipes that NFC may have had.  This list includes individuals that managed different production facilities during NFC's sporadic history as well as Board members and his legal representation.  Bessermin denies that the Defendant tried to contact him about the Missing Recipes.

[57] The Defendant provided recreated recipes for Boston cream pie and pizza dough.  (Day 3, Vol. 2, pp. 126-127)  The Court is not finding that the recreated recipes are the Missing Recipes.

The Plaintiff is seeking a Permanent Injunction compelling the Defendant to turnover the Missing Recipes[58] and the Laptop as well as enjoining the Defendant from using, concealing or otherwise failing to preserve those assets for the benefit of Naturally ME.  The Court granted a Preliminary Injunction on August 13, 2004 (Doc. 13).[59]  "The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies . . ."  *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959).  In the First Circuit, the moving party must demonstrate (1) irreparability of injury; (2) "actual success" on the merits of the claim; (3) effect on the public interest; and (4) the balance of the relevant equitities.  *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914-15 (1st Cir. 1989).

The Court has already found the Defendant liable for conversion, and therefore the element "success on the merits" has been met.  The Plaintiff has established that it will be irreparably harmed if the Defendant does not turn over the Missing Recipes and/or is not enjoined from using the Missing Recipes for his own benefit.  Pie sales are very cyclical.  The Plaintiff's current product line achieves most of its sales in the fourth quarter between the Thanksgiving and the New Year holidays.  The Missing Recipes would help balance the Plaintiff's product line and increase sales during the rest of the year.  It is also clear to the Court that the Plaintiff will be harmed if the Defendant or others bring the Missing Recipes to production.

The Court grants the Permanent Injunction compelling the Defendant to turnover the Missing Recipes and the Laptop as well as enjoining the Defendant from using, concealing, or otherwise failing to preserve those assets for the benefit of the Plaintiff.

<u>Count Five: Civil Contempt</u>

---

[58] The Missing Recipes are Boston cream pie, non-dairy lemon pie, key lime pie, walnut torte cake, chocolate cake, carrot cake, muffins, pizza dough, and brownies.
[59] The Preliminary Injunction ordered the Defendant to turnover the Missing Laptop (Apple Computer, iBook, serial number UV2030D4LLL); the Missing Recipes (specifically, the recipes for chocolate cake, key lime and Boston cream pies, lemon and walnut tortes, and pizza mix); and the Missing Equipment.

The Plaintiff is seeking an order holding the Defendant in civil contempt for his failure to comply with the Sale Order (from November 24, 2003) and the First Preliminary Injunction (from August 13, 2004) (Doc. 13). "The purpose of civil contempt is to coerce compliance with an order of the court." *U.S. v. Marquardo*, 149 F.3d 36, 39 (1st Cir. 1998). "To establish contempt, [movant] must show by clear and convincing evidence that [the nonmovant] violated a specific order of the court and failed to achieve substantial and diligent compliance with that order in a meaningful way. In short, there must be a lack of substantial compliance." *Sunbeam Corp. v. Black & Decker (U.S.) Inc.*, 151 F.R.D. 11, 15 (D.R.I. 1993). "[W]hile good-faith efforts do not insulate a defendant in a contempt action, our precedent permits a finding of contempt to be averted where diligent efforts result in substantial compliance with the underlying order." *Accusoft Corp. v. Palo*, 237 F.3d 31, 47 (1st Cir. 2001). "The determination of whether substantial compliance has been achieved will 'depend on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." *Accusoft* at 47 *quoting Fortin v. Comm'r of Mass. Dept. of Pub. Welfare*, 692 F.2d 790, 795 (1st Cir. 1982). "Any ambiguities or uncertainties in the court order must be read in a light favorable to the person charged with contempt." *Sunbeam* at 15 citing *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991).

The Court finds that the Defendant has not made diligent efforts to comply with the Preliminary Injunction. The Defendant alleged that he contacted Brian Bolster, Greg Oberhauser, Greg Bessermin, Charles Mailman, and Martin Adonean to recover any recipes that NFC may have had. This list includes individuals that managed different production facilities during NFC's sporadic history as well as former NFC Board members and the Defendant's legal representation. First, Attorney Oberhauser is the one who tried contacting several of these individuals in compliance with the Court's Order dated September 8, 2004. (Doc. 24) And more significantly, during the trial the Defendant said he "recreated" several of the Missing Recipes based upon the

documents obtained from Bolster and Mailman. The Defendant had access to these documents for

several months prior to trial commencing, however it was not until the trial began that he was able

to "recreate" some of the Missing Recipes. The Court finds these actions to be too little, too late.

The Defendant did not make diligent efforts that resulted in substantial compliance. Many of the

Missing Recipes as well as the Laptop have not been produced. The Court has already addressed the

issues surrounding the credibility of the Defendant.

The Court finds the Defendant to be in civil contempt of its Sale Order from November 23,

2003 and it First Preliminary Injunction Order from August 13, 2004.

Damages

The Court now turns its attention to damages. "Consequential damages . . . resulting from

and caused by a conversion are recoverable in appropriate cases." *Food Specialties, Inc. v. John C.*

*Dowd, Inc.*, 339 Mass. 735, 748, 162 N.E.2d 276, 283 (Mass. 1959). Lost profits can be recovered in

conversion cases and are subject to rules of certainty as are other claims of lost profits. Dan B.

Dobbs, *Law of Remedies* § 5.15 (2nd ed. 1993). "Prospective profits may be recovered in an

appropriate action when the loss of them appears to have been the direct result of the wrong

complained of and when they are capable of proof to a reasonable degree." *Augat, Inc. v. Aegis,Inc.*,

417 Mass. 484, 488, 631 N.E.2d 995, 998 (1994) quoting *Lowrie v. Castle*, 225 Mass. 37, 51-51, 113

N.E. 206 (1916). "The amount of damages need not be proved with mathematical precision; the

extent of damages often must be left to estimate and judgment." *Our Lady of the Sea Corporation v.*

*Borges*, 40 Mass.App.Ct. 484, 488, 665 N.E.2d 128, 131 (1996).

Turning to the damage calculation, the Court had thoroughly reviewed the testimony of the

two experts proffered by the Plaintiff, Messrs. Burke and Filler, and finds both were qualified and

thorough in the explanation of their calculations, however, the Court found the sales projections of

Mr. Burke overly optimistic, perhaps because the underlying sales projections by the Plaintiff's "out-

sourced" sales manager, Mr. Davey, was aggressively optimistic.  Mr. Burke used two different

approaches in reaching his figure for potential sales on five proposed items[60]:  the "bottom-up

approach"[61] and the "top-down approach."[62]  Using the bottom-up approach, Mr. Burke estimated

the Plaintiff's total sales for the five (5) Targeted Missing Recipes[63] to be $50,539,484 over the next

ten years.  Using the top-down approach, Mr. Burke estimated the Plaintiff's total sales for the five

products to be $50,971,206 over the next ten years.  A downward adjustment of these projected

sales figures is appropriate for factors such as the Plaintiff's lack of large amounts of capital, relative

newness to the marketplace including lack of name branding, Plaintiff's lack of sophistication in the

logistics of the industry (primarily packaging and shipping), and anticipated growth in competition to

name just a few.  The accounting expert, Mark D. Filler, C.P.A. also discounted the same number by

a substantial amount because of capacity constraints (Day 5, Vol. 2, p. 192), and has further taken

the various risk items into consideration in establishing his discount rate. (Day 5, Vol 2, p. 186; Pl.

Ex. 47, Ex. A)  As reasonable reductions have already been made, the Court sees no reason to

disturb them and accepts Mr. Filler's estimates.

In reviewing both experts testimony in anticipation of making appropriate reductions, the

Court finds that the present value of the lost profits Naturally ME, Inc. will incur because of the five

(5) Targeted Missing Recipes is $2,300,000.00.

The Plaintiff sufficiently established that the Defendant is in contempt of the Sale Order and

the Preliminary Injunction (Case No. 03-10462; Doc. 248, Case No. 04-1429,Doc. 13).  The Court

---

[60] The five new products that Mr. Burke's report is based upon are Boston cream pie, lemon pie, carrot cake, muffins, and pizza dough.

[61] Mr. Burke described this approach as looking at the number of stores the Plaintiff would expect to sell into each year as well as the number of items it would expect each store to carry and a reasonable sell rate for those categories.  He then looked at the pricing per product and multiplied that to get an estimate of dollar sales.  (Day 5, Vol. 1, p. 60)

[62] The top-down approach looks at the total sales of each category of product and the market share that the new product would reasonably be expected to achieve.  Mr. Burke looked at the size of the category and the other competitors and used his judgment to determine a reasonable market share.  (Day 5, Vol. 1, pp. 60-61; 81-82)

[63] The Targeted Missing Recipes are Boston cream pie, non-dairy lemon pie, carrot cake, muffins, and pizza dough.

finds that a monetary award is appropriate to compensate the Plaintiff for the legal fees it has spent

pursuing the Defendant from the date it purchased NFC's assets through closing arguments on

April 14, 2006.  The Court is awarding damages to the Plaintiff under both Counts One and Five,

conversion and civil contempt respectively.  The Plaintiff is allowed, however, only one recovery for

damages.  The Plaintiff is also allowed recovery for legal fees under Count Five for civil contempt.

Counsel for the Plaintiff is hereby ordered to submit a fee application on or before September 1,

2006.  The Court will set deadlines for filing objections and for a hearing on the fee application by

separate order.

Discussion for Adversary Proceeding 05-4095[64]

Count One:  Nondischargeability of Debt– False Pretenses or Fraud

The Plaintiff alleges that the Defendant knowingly and willfully made false representations

to the Plaintiff with the intent and the purpose to deceive the Plaintiff regarding NFC's assets that

were purchased through the court-approved sale on November 23, 2003.  Pursuant to 11 U.S.C. §

523(a)(2)(A):

> A discharge of this title does not discharge an individual debtor from any debt –
> (2) for money, property, services, or an extension, renewal, or refinancing of
> credit to the extent obtained by –
> (A) false pretenses, a false representation, or actual fraud, other than
> a statement respecting the debtor's or an insider's financial condition.

Elements for false representation, false pretenses and actual fraud are that (1) the debtor made a

knowingly false representation or one made in reckless disregard of the truth; (2) the debtor

intended to deceive; (3) the debtor intended to induce the creditor to rely upon the false statement;

(4) the creditor actually relied upon the misrepresentation; (5) the creditor's reliance was justifiable;

and (6) the reliance upon the false statement caused damage.  *Glen McCrory & Ann McCrory v. Robert*

---

[64] Counts Two and Three were withdrawn by the Plaintiff.

*T. Spigel* (*In re Spigel*), 260 F.3d 27, 32 (1st Cir. 2001) citing *Palmacci v. Umpierrez* 121 F.3d 781, 786 (1st Cir. 1997).

It is necessary that the party relied on the representation. Reliance on the false representation must be "justifiable" under the circumstances. See *Field v. Mans*, 516 U.S. 59 (1995). "The creditor must show that he actually and justifiably relied on the false statement or statements." *Aoki v. Atto Corporation* (*In re Aoki*), 323 B.R. 803, 815 (1st Cir BAP 2005). This is a very low standard for the creditor. "A party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation." *Sanford Inst. For Sav. v. Gallo*, 156 F.3d 71, 75 (1st Cir. 1998).

The Court finds that the Defendant did not make false representations regarding the assets purchased by the Plaintiff. The Court finds that the Defendant did not make false representations to the Plaintiff. The instant case is between the Plaintiff, Naturally ME, which purchased the assets of NFC through a court-approved sale on November 23, 2003, and the Defendant, the president of NFC. If the Defendant made any false representations, they were made to the individuals Roberts, Mrs. Roberts, Redden, and perhaps others when the Defendant was soliciting investors for NFC. In the fall 2001, the Defendant suggested to the Roberts and Redden that NFC had 200 – 300 recipes. This occurred several years before the Plaintiff was incorporated. The Defendant's discussions and inducements may have impacted the decisions of the Roberts and Redden to invest in NFC. The Court is hard pressed to find that the Defendant made false representations to an entity that was not in existence during the initial conversations. It is significant that his comments were to potential investors in NFC, not to a potential purchaser of NFC's assets.

The Court finds for the Defendant on Count One.

<u>Counts Four and Five: Nondischargeability of Debt – Embezzlement and Larceny</u>

69

The Plaintiff alleges that the Defendant embezzled NFC's assets which the Plaintiff purchased and, or in the alternative, committed larceny by permanently depriving the Plaintiff of NFC's assets, thereby, making his debt nondischargeable pursuant to 11 U.S.C. § 523 (a)(4).[65]  The question of what constitutes embezzlement and larceny within the meaning of § 523(a)(4) is a question of federal law.  The elements for embezzlement are (1) entrustment to the debtor of (2) property (3) of another (4) which the debtor appropriates for his own use (5) with the intent to defraud.  *Adamo v. Scheller* (*In re Scheller*), 265 B.R. 39, 53 (Bankr. S.D. N.Y. 2001) and *American Ins. Co. v. Graziano* (*In re Graziano*), 35 B.R. 589, 594 (Bankr. E.D. N.Y. 1983).  The elements of larceny are (1) the wrongful taking of (2) property (3) of another (4) without the owner's consent (5) with the intent to convert the property.  *Hancock v. Caliri* (*In re Caliri*), 335 B.R. 2, 12 (Bankr. D. Mass. 2005).  "Larceny differs from embezzlement only in 'the manner in which the funds or property come into the possession of a party.'"  *Lisk v. Criswell* (*In re Criswell*), 52 B.R. 184, 202 (Bankr. E.D. Va. 1985) (*quoting In re Graziano*, 35 B.R. 589, 594 (Bankr. E.D. N.Y. 1983).  In this case the only distinction between embezzlement and larceny is when the Defendant formed the intent to appropriate the Missing Recipes for himself.  The Plaintiff must prove embezzlement and/or larceny by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 287-88, 111 S.Ct. 654, 659-60 (1991).

The Court finds that the Defendant embezzled NFC's assets while president of NFC.  At the beginning of the involuntary bankruptcy, the Defendant had the lawful possession of the Missing Recipes and Laptop as president of NFC.  The Court finds that the Defendant's intent to appropriate the Missing Recipes and Laptop for his own use came relatively early in the bankruptcy.  The Defendant claimed to own the trademark and all the recipes with his wife.  The Court cites the

---

[65]  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
        (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

following examples.  In negotiations with Trumark Industries in spring of 2003, the Defendant

sought to sell certain assets to Trumark; the sale was contingent upon Trumark entering into a

licensing agreement with the Defendant and Mrs. Attridge for the trademark and all the recipes, the

"Intellectual Property." (Day 1, Vol. 2, pp. 196-197; Day 2, pp. 8-9, 11; Pl. Ex. 49)  As of April 15,

2006, when NFC assented to the Order for Relief, the Defendant still claimed ownership of the

Intellectual Property.  The Defendant told Harbeson, counsel for NFC, that NFC was the licensee

of certain proprietary recipes and other Intellectual Property owned by the Defendant. (Day 2, p.

13; Pl. Ex. 50, Schedule B)  And finally, during the 341 meeting held on May 22, 2003, the

Defendant asserted that he and his wife owned the Intellectual Property, including all recipes. (Day

1, Vol. 1, p. 17; Day 2, pp. 25, 27; Pl. Ex. 54)  The issue of ownership was subsequently resolved on

July 7, 2003, when the Court entered a Final Judgment declaring that the Defendant and his wife

"hold no ownership or other interests in the Recipes or Trademark, and are permanently enjoined

from using, concealing from the Trustee . . . the Recipes or the Trademark." (Joint Pretrial

Statement, Stipulated Fact #11)  The Defendant, however, never turned over the Missing Recipes or

the Laptop to the Chapter 11 Trustee.  Therefore, the Court finds that the Defendant embezzled

NFC's assets.

 In the alternative, the Court finds that the Defendant did commit larceny by permanently

depriving the Plaintiff of NFC's assets after the court-approved sale on November 23, 2003.  As

stated above, once the order for relief was entered, the Missing Recipes and the Laptop became

property of the estate.  The Defendant had an obligation to turnover these assets to the Ch. 11

Trustee at that time.  11 U.S.C. § 542(a) (2006).  The Defendant demonstrated a consistent

unwillingness to turnover the Missing Recipes and the Laptop.  Initially, he claimed that he and his

wife owned the recipes.  During that time he continued to hold onto the Missing Recipes and the

Laptop.  Finally, he filed a *pro se* objection to the purchase of the assets by the Plaintiff.  In the end,

for more than two years, he simply failed to turnover the Missing Recipes and the Laptop initially to the Trustee and then to the Plaintiff, who he clearly knew was entitled to these assets.

The Court finds that the Defendant's debt is excepted from discharge in his bankruptcy proceeding under 11 U.S.C. § 523(a)(4).

### Count Six: Nondischargibility of Debt – Willful and Malicious Injury

In Count Six, the issue is whether the Defendant willfully and maliciously injured the Plaintiff by converting NFC's assets and therefore his debt is not discharged pursuant to 11 U.S.C. § 523(a)(6). Under *Kawaauhau v. Geiger*, the Supreme Court held that negligent or reckless conduct does not constitute "willful and malicious" conduct and does not fall within the section 523(a)(6) discharge. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974 (1998). The Supreme Court concluded that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Dennis Caci v. John W. McDonald and Arlene F. Brink (In re Brink)*, 333 B.R. 560, 566-67 (Bankr. D. Mass. 2005) citing *Kawaauhau* at 61.

While *Kawaauhau* defined "willful", the Court did not "provide discreet illumination for 'malicious.'" *Brink* at 567 citing *Gomes v. Limieux (In re Limieux)*, 306 B.R. 433, 439 (Bankr. D. Mass. 2004). The creditor must show evidence of the debtor's malice. "'[M]alice' under § 523(a)(6) requires 'a showing that the debtor's willful, injurious conduct was undertaken without just cause or excuse.'" *Limieux* at 440 quoting *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 21 (Bankr. D. Maine 1998). See also *Printy v. Dean Witter Reynolds, Inc. (In re Printy)*, 110 F.3d 853 (1st Cir. 1997). The conduct must be intended to necessarily cause injury before a debt may be deemed dischargeable.

The Court has already found that the Defendant liable for conversion of the Missing Recipes and Laptop purchased by the Plaintiff from NFC. The Court finds that the Defendant converted the Missing Recipes and the Laptop with the intent to cause the Plaintiff injury. The Defendant did

not want the Plaintiff to manufacture products using NFC's recipes.  The Defendant knew that it

would financially harm the Plaintiff.  He has had over two years to turnover the Missing Recipes and

the Laptop.  His behavior cannot be deemed reckless or negligent.  His attempts to prevent the

distribution of the Missing Recipes stretch back to right after the filing of the involuntary

bankruptcy when he tried to reach an agreement to sell NFC's assets to Mr. Brace and Trumark

Industries.  Even then he tried to maintain control of the recipes by requiring Trumark to enter into

a licensing agreement regarding NFC's recipes.  This intent to cause injury is further bolstered by his

*pro se* objection to the sale of the assets to the Plaintiff.  In the Defendant's objection, he said that

the term "Recipes" was being interpreted to broadly.  He attempted to argue that the "Recipes" that

were to be included in the sale were only those commercially produced.  (Pl. Ex. 57)  The Court did

not agree with that assessment.  Once the sale was approved, the Defendant had an obligation to

turnover any and all of NFC's assets that he had in his possession.  11 U.S.C. § 542(a) (2006*). MEC*

*Steel Buildings, Inc. v. San Lorenzo Construction Corp. (In re MEC Steel Buildings, Inc.*), 136 B.R. 606, 608

(Bankr. D. P.R., 1992) (Pursuant to § 542(a) defendant must turnover property belonging to the

estate unless of inconsequential value or benefit to the estate).  To date, the Defendant has not fully

complied.  The Plaintiff has adequately established the elements of § 523(a)(6).

The Court finds that the Defendant's debt is excepted from discharge in his bankruptcy

proceeding under 11 U.S.C. § 523(a)(6).

Separate orders will issue.

Date:  August 9, 2006

Joel B. Rosenthal
United States Bankruptcy Judge